

RECEIVED

Apr 08, 2025

U.S. COURT OF APPEALS FIFTH CIRCUIT

UNITED STATES COURT OF APPEALS FOR
THE FIFTH CIRCUIT

| | | |
|---|---|---|
| Prime International Shipping LLC, | ) | Fifth Circuit Docket No. _____ |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | OSHRC Docket No. 23-0152 |
| | ) | |
| Lori Chavez-DeRemer, the Secretary, | ) | Inspection No. 1607807 |
| United States Department of Labor, | ) | |
| | ) | |
| *Respondent*. | ) | |

**TO THE HONORABLE JUSTICES OF THE FIFTH CIRCUIT:**

Petitioner, Prime International Shipping LLC, hereby petitions the Court for review of the decision regarding Citation 1, Items 1 and 4, set forth on pages 1 through 32 of the Order of the United States of America Occupational Safety and Health Review Commission in OSHRC Docket No. 23-0152 entered on February 28, 2025.

## VENUE

Pursuant to section 11(a) of the Occupational Safety and Health Act, venue is proper in the Fifth Circuit Court of Appeals because the alleged violation in the above-referenced matter occurred in Houston, Texas.

## FACTS

The above-referenced matter was heard before the Administrative Law Judge in Houston, Texas, on July 16, 2024, and he issued his decision on January 17, 2025. The decision was docketed with the Commission on January 29, 2025. A copy of the Administrative Law Judge's Decision and Order is attached as Exhibit A and hereby incorporated by reference.

Petitioner timely submitted a Petition for Discretionary Review to the OSHA Review Commission on February 13, 2025. A copy of the Petition for Discretionary Review is attached as Exhibit B and hereby incorporated by reference.

The OSHA Commission did not direct review of the Administrative Law Judge's Decision and Order. As a result, the Administrative Law Judge's Decision and Order became a Final Order of the OSHA Review Commission on February 28, 2025. The OSHA Review Commission's Final Order is attached as Exhibit C and hereby incorporated by reference. Because Petitioner's attempt to seek review from the OSHA Review Commission was denied, Petitioner has exhausted its administrative remedies. As a result, Petitioner now seeks review by the Fifth Circuit Court of Appeals.

## PRAYER

Wherefore, premises considered, Petitioner Prime International Shipping LLC prays that the Court review and ultimately vacate the decision regarding Citation 1, Items 1 and 4 set forth on pages 1 through 32 of the Order of the United States of America Occupational Safety and Health Review Commission in OSHRC Docket No. 23-0152 entered February 28, 2025, and grant all such other relief to which Prime International Shipping LLC is justly entitled to.

Respectfully submitted,

P. BATES LAW, PLLC

By: */s/Patrick C. Bates*
    Patrick C. Bates
    State Bar No. 24068882
    Federal ID No.  2014055
    Philip J. Nolen
    State Bar No. 24109529
    Federal ID No. 3416086
    711 W. Bay Area Blvd., Suite 675
    Houston, Texas 77598
    Ph:   (713) 487-8660
    Fax:  (346) 502-3571
    Email: patrick@pbateslaw.com
    Email:  philip@pbateslaw.com

ATTORNEYS FOR PETITIONER PRIME
INTERNATIONAL SHIPPING LLC

<u>**CERTIFICATE OF SERVICE**</u>

   I certify that I served a true and correct copy of the foregoing instrument on all counsel of record in accordance via e-mail and/or USPS First Class Mail and/or filing with the E-File System on April 7, 2025 including the below.

   Aletsey Z. Hinojosa
   U.S. Department of Labor
   Office of the Solicitor
   525 S. Griffin Street, Room 501
   Dallas, Texas 75202
   Telephone: (972) 850-3154
   Email: hinojosa.aletsey.z@dol.gov; and docket.dallas@dol.gov

   Michael D. Schoen
   U.S. Department of Labor
   Office of the Solicitor
   525 S. Griffin Street, Room 501
   Dallas, Texas 75202
   Telephone: (972) 850-3145
   Cell: (202) 594-6077
   Email: schoen.michael@dol.gov; and docket.dallas@dol.gov

   Executive Secretary
   Occupational Safety and Health Review Commission
   1120 20th St., N.W., Suite 980
   Washington, D.C. 20036-3419

   Louise M. Betts, Counsel for Appellate Litigation
   Heather R. Phillips, Counsel for Appellate Litigation
   Office of the Solicitor, U.S. DOL
   Room S4004 200 Constitution Avenue, N.W.
   Washington, D.C. 20210

          */s/Patrick C. Bates*
          Patrick C. Bates

**EXHIBIT**

**A**



United States of America
**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**
United States Custom House
721 19th Street, Room 407
Denver, Colorado 80202

Phone: (303) 844-2284                                                   Fax: (303) 844-3759

## Notice of Decision

**In Reference To:**

**Secretary of Labor v.** PRIME INTERNATIONAL SHIPPING LLC

**OSHRC Docket No.**: 23-0152

1. Enclosed is a copy of my decision. The entire record, including this decision, shall constitute the report of this Administrative Law Judge pursuant to section 12(j) of the Occupational Safety and Health Act of 1970 (the Act), 29 U.S.C. § 661(j). The Judge's report, which includes this decision, will be filed with the Commission's Executive Secretary on **January 29, 2025.** *See* Commission Rule 90(b), 29 C.F.R. § 2200.90(b). The Executive Secretary will then issue a "Notice of Docketing of Administrative Law Judge's Decision" that notifies all parties of the date that the Executive Secretary dockets the Judge's report, and that will state the date by which a party must file a petition for discretionary review.

2. *Commission final order.* The decision shall become a final order of the Commission thirty (30) days from the date the Executive Secretary dockets the decision, unless a Commission member directs review of the Decision within that time. *See* Section 12(j) of the Act; Commission Rule 90(f), 29 C.F.R. § 2200.90(f).

3. *Party adversely affected or aggrieved by the decision.* A party adversely affected or aggrieved by the decision of the Judge may seek review by the Commission by filing a petition for discretionary review with the Executive Secretary at any time following the service of the Judge's decision on the parties but no later than 20 days after the date of docketing of the Judge's report. *See* Commission Rule 91(b), 29 C.F.R. § 2200.91(b). The Executive Secretary's address is as follows:

   **Executive Secretary**
   **Occupational Safety and Health Review Commission**
   **One Lafayette Centre**
   **1120 20th Street NW, Suite 980**
   **Washington, D.C. 20036-3457**

   The full text of the rule governing the filing of a petition for discretionary review is Commission Rule 91, 29 C.F.R. § 2200.91.

4. *Correction of errors in the Judge's report.* Up to the time that either the Commission directs review of the decision or the decision becomes a final order of the Commission, a request to correct clerical errors arising through oversight or inadvertence in the decision or in other parts of the Judge's report shall be filed with the undersigned Judge, by motion, pursuant to Commission Rule 90(b)(4)(i), 29 C.F.R. § 2200.90(b)(4)(i). Motions shall conform to Commission Rule 40, 29 C.F.R. § 2200.40.

5. *Relief from default.* Requests for relief from default or for reinstatement of the proceeding may be filed with the undersigned Judge, by motion, until the date the Executive Secretary dockets the Judge's report. *See* Commission Rule 90(c), 29 C.F.R. § 2200.90(c). Motions shall conform to Commission Rule 40, 29 C.F.R. § 2200.40.

6. *Filing with Executive Secretary.* Except for motions filed to correct errors in the Judge's report discussed in paragraph 4 above, on or after the date the Executive Secretary dockets the Judge's report, all documents shall be filed with the Executive Secretary. *See* Commission Rule 90(d), 29 C.F.R. § 2200.90(d).

*/s/ Joshua R. Patrick*

DATED:  January 17, 2025       Joshua R. Patrick
       Denver, Colorado     Administrative Law Judge, OSHRC

## United States of America
## OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

SECRETARY OF LABOR,

    Complainant,

    v.

PRIME INTERNATIONAL SHIPPING, LLC,
and its successors,

    Respondent.

OSHRC Docket No. 23-0152

Appearances:

    Aletsey Z. Hinojosa, Esq., Michael D. Shoen, Esq., Department of Labor, Office of
    Solicitor, Dallas, Texas,
      For Complainant

    Patrick C. Bates, Esq., Philip J. Nolen, Esq., P. Bates Law, PLLC, Houston, Texas
      For Respondent

Before:  Judge Joshua R. Patrick – U. S. Administrative Law Judge

## DECISION AND ORDER

### I.    Introduction

In response to a report of a fatality at Respondent's place of business, Complainant initiated

an inspection that concluded with Complainant issuing a four-item Citation and Notification of

Penalty. For the most part, the specifics of the alleged violations—which include a failure to train,

a failure to cover floor holes, and a failure to properly guard a chop saw—are not particularly

complicated. The wrinkle in this case is whether the workers identified by the Compliance Safety

and Health Officer (CSHO) as being exposed to a hazard were Respondent's employees.

Respondent stipulated to being a covered employer under the Act but now argues that the exposed workers were independent contractors. Therefore, this dispute is not about whether OSHA has jurisdiction over Respondent, but whether Complainant can prove Respondent had employees that were exposed to the hazard. Whether viewed under the Commission's application of the *Darden* factors or the Fifth Circuit's economic realities test, the Court finds Respondent's attempts to characterize these workers as anything other than employees are merely a thin veneer designed to give the appearance of a relationship that does not exist in economic reality.

Based on the following findings of fact and conclusions of law, the Court finds the Citation and Notification of Penalty shall be AFFIRMED in part and VACATED in part.

## II. Procedural History

In response to a reported fatality, Complainant dispatched CSHO Simon Cabello to conduct an inspection of Respondent's facility.[1] During the course of his inspection, CSHO Cabello conducted interviews with Yaser Salem, the owner/operator of Respondent; Adam Abdirahman, an office worker and forklift operator; and Jose Vasquez and Ricardo Gonzalez, two members of a three-person crew charged with loading cars into shipping containers.[2] In addition, CSHO Cabello observed the work practices of Respondent; the conditions of the facility; and reviewed documentary, video, and photographic evidence. As a result of his inspection, CSHO Cabello recommended, and Complainant issued, a four-item Citation and Notification of Penalty (Citation), alleging four serious violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq* (Act). Respondent timely contested the Citation.

---

[1] The citation related to the fatality was withdrawn by the Secretary on the day of trial. (Tr. 11-12). As such, the parties agreed to refer to the fatality precipitating the inspection as "the incident". (Tr. 27).

[2] The third member of the crew is the worker whose death precipitated the inspection.

A one-day trial was held on July 16, 2024, in Houston, Texas. At the outset of the trial, Complainant moved to withdraw Citation 1, Item 2, which was accepted by the Court. Thus, the remaining items for review are Citation 1, Items 1, 3, and 4. The following people provided testimony with respect to these remaining items: (1) CSHO Simon Cabello; (2) Jose Vasquez, a putative employee of Respondent;[3] and (3) Yaser Salem, the owner/operator of Respondent. Both parties timely submitted post-trial briefs for the Court's review.

### III.    Stipulations and Jurisdiction

Complainant and Respondent reached several stipulations prior to trial, both factual and legal, which the Court will incorporate by reference.[4] Those stipulations include: (1) the Commission has jurisdiction over this matter under section 10(c) of the Act, and (2) Respondent is an employer engaged in a business affecting interstate commerce within the meaning of section 3(5) of the Act. (Jt. Stip. Nos. 1, 2).

### IV.    Factual Background

#### A. Respondent's Business

According to Salem, Respondent is primarily a freight forwarding company that also provides warehousing and local shipping. (Tr. 132). Salem testified the freight forwarding aspect of his business entails receiving and fulfilling orders for shipments of vehicles overseas. (Tr. 132). Salem provides the loading crew with a list of vehicles, which are, in turn, associated with a shipping container number. (Tr. 134-35). The loading crew is then charged with loading the cars into the appropriate container, which is ultimately shipped overseas. (Tr. 134-35).

---

[3] As noted above, the Court ultimately finds Mr. Vasquez and his fellow workers were employees of Respondent; however, for the purposes of Mr. Vasquez's as-yet undetermined status at the time of trial, the Court will classify him as such.

[4] Where applicable, the Court shall cite those stipulations as follows: Jt. Stip. No. ___.

Salem testified Respondent only has three employees: himself, an office worker named Navilla, and Adam Abdirahman, an office worker who also operates forklifts. (Tr. 133). The loading crew, according to Salem, is staffed by independent contractors. (Tr. 133-34). In support of this claim, Respondent introduced the following evidence: (1) a single 1099 Non-Employee Compensation (NEC) form for Jose Vasquez; (2) Salem's claim that he provided virtually no supervision over the loading crew's work; and (3) Salem's claim that he deducted operating expenses, such as the use of the forklift, the chop saw, and other tools, from the purported independent contractor's wages. (Tr. 141, 144, 150; Ex. R-26b).

According to Vasquez, his crew was responsible for loading cars into the containers, which involved the use of a forklift, lumber, and steel cable to suspend cars within the storage container. (Tr. 82, 109). Vasquez had been performing this work for Salem for approximately a year-and-a-half at the time of the accident. (Tr. 119, 121, 122). He stated, "I consider [Salem] to be my boss". (Tr. 121, 122). Vasquez testified he worked "over 40" hours per week and "five sometimes six" days per week for Respondent. (Tr. 119). Vasquez testified he was paid weekly, initially by check and then electronic payments by Zelle. (Tr. 119). With respect to the 1099-NEC form, Vasquez confirmed his name was on it, but when asked whether the upper-right hand corner of the form says "non-employee compensation", Vasquez inquired, "What does that mean?" (Tr. 124).

At the beginning of each day, Salem gave Vasquez and crew a list of cars to prepare for when the containers arrived. (Tr. 120). Once the containers arrived, the crew began loading the cars according to the list. (Tr. 120). If the cars would not fit according to the container list, Vasquez would report to Salem, who would work with the vehicle owner to reorganize the order, including replacing an oversized car with a smaller one. (Tr. 134, 146). Salem insisted the decision as to whether the container could hold the requested vehicles and, thus, fulfill the order according to the

4

shipping list belonged solely to the loading crew. (Tr. 145-46). Vasquez testified, in addition to the materials mentioned above, loading required an air gun, compressor, nail gun, tape measures, sockets to remove tires, and a camera to take photos of the cars. (Tr. 120-21). Aside from labor, all the equipment and materials were provided by Respondent. (Tr. 121). Further, Vasquez testified he was required to notify Salem if he needed to miss work and would ask Salem if he had questions regarding his job duties or safety precautions. (Tr. 121). On cross-examination, Vasquez was asked, "Prime did not control how you went about loading the vehicles in the container, correct?" In response, Vasquez testified, "No, but they would tell us how they wanted them specifically." (Tr. 123). When further pressed by Respondent's counsel about whether CSHO Cabello asked about Respondent's level of control over their job duties, Vasquez testified, "Not control *but they would tell us specifically how to prepare the base*." (Tr. 123) (emphasis added).

### B. OSHA Inspection & Citation

CSHO Cabello testified he was sent to Respondent's workplace in response to the report of a fatality on July 12, 2022. (Tr. 49). CSHO Cabello initiated the inspection on July 13, 2022, and it lasted for two days. (Tr. 52). At the outset, he conducted an opening conference with Salem and then proceeded to observe Respondent's work practices.[5] (Tr. 50). During the inspection, the loading crew was loading cars into a shipping container. (Tr. 50).

CSHO Cabello observed what he believed to be four separate violations of the Act; however, as noted above, only three of those alleged violations have been presented to the Court for review. First, CSHO Cabello observed a gap between the dock floor and the rear-end of a shipping container, which was situated on a semi-truck trailer. (Tr. 53; Ex. C-2d). According to

---

[5] The witnesses referred to Yaser Salem, owner of Respondent, in numerous ways, including "Mr. Yaser", "Yaser", and "Mr. Salem". These all refer to the same individual. The Court will refer to him as either "Salem" or "Mr. Salem".

the CSHO's measurements,[6] the gap between the dock floor and the trailer was approximately eight inches. (Tr. 53). The dock floor is equipped with large rubber bumpers, which prevent truck drivers from damaging the floor while backing up but also create the aforementioned gap. (Tr. 116, 138; Ex. C-2a). The distance from the dock floor to the ground was four feet, three inches. (Tr. 53). Through interviews, observation, and review of closed-circuit video, CSHO Cabello determined the loading crew traversed this gap, or one similar to it, on both July 12 & 13, 2022. (Tr. 90-92, 102-103; Ex. C-7, R-5). Vasquez and Salem testified that a dock plate, which is used to span such a gap, was available, but that it was typically only used when there was a height difference between the container and the dock floor or when the vehicle's ground clearance was too low. (Tr. 62, 113-114, 130, 139).

Second, during his review of the worksite, CSHO Cabello saw a chop saw that had the guard tied up. (Tr. 79; Ex. C-5a, b, c). Vasquez testified the loading crew used a chop saw to cut wire, but he could not recall using the chop saw in that condition. (Tr. 116-117). In fact, he testified that the guard would only be removed when the blade was being replaced. (Tr. 117). Salem testified that he supplied the saw but only the loading crew used it to cut wire rope for loading cars. (Tr. 130, 140).

Third, CSHO Cabello observed both Adam Abdirahman and Salem operating forklifts without seatbelts, which prompted him to inquire about the training they had received. (Tr. 68-69, Ex. C-4c). Both Salem and Abdirahman told CSHO Cabello they received on-the-job, practical training, but, according to CSHO Cabello, there was no evidence to suggest either of them had received formal, instruction-based training. CSHO Cabello also testified that Salem said he had not provided forklift training to his employees. (Tr. 71). Salem testified he trained Abdirahman;

---

[6] As noted in CSHO Cabello's testimony, he was assisted by CSHO Faulkner during his inspection, including taking measurements. (Tr. 53).

however, the details of that training are unclear, and neither Salem nor Abdirahman possesses a certification. (Tr. 94).

Based on these observations, CSHO Cabello proposed, and Complainant issued, a Citation and Notification of Penalty alleging the foregoing conditions constituted violations of the Act and proposed a penalty of $10,566.[7] Those alleged violations are discussed below.

## V. Analysis

### A. Legal Standard for Violations Alleged Under Section 5(a)(2)

To establish the violation of a safety standard under the Act, the Secretary must prove: (1) the cited standard applies; (2) the employer failed to comply with the terms of that standard; (3) employees had access to the hazardous condition covered by the standard; and (4) the employer knew, or with the exercise of reasonable diligence could have known, of the violative condition. *Atl. Battery Co.*, No. 90-1747, 1994 WL 682922, at * 6 (OSHRC, Dec. 5, 1994). The Secretary has the burden of establishing each element by a preponderance of the evidence. *The Hartford Roofing Co.*, No. 92-3855, 1995 WL 555498, at *3 (OSHRC, Sept. 15, 1995).

Prior to addressing the question of whether Complainant has established her prima facie case, the Court must first address a question each of the alleged violations has in common: were the members of the loading crew Respondent's employees? The Court will analyze this question using: (1) the Commission's iteration of the Supreme Court's test in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992); and (2) the Fifth Circuit's "economic realities" test, as enunciated in *Parrish v. Premier Directional Drilling LP*, 917 F.3d 369, 379 (5th Cir. 2019).[8]

---

[7] The total listed here does not include Citation 1, Item 2, which was withdrawn by the Secretary.
[8] Prior to the Supreme Court's decision in *Darden*, and the Commission's subsequent adoption of it, the Commission also applied the economic realities test to determine whether a particular worker was an employee of the cited employer. *Griffin & Brand of McAllen*, No. 14801, 1978 WL 7060, at *2 n.6 (OSHRC, June 9, 1978). As such, there is a fair amount of overlap in what the Commission and the Fifth Circuit consider relevant and persuasive.

## B. The Loading Crew Workers Are Employees of Respondent

As noted above, Respondent has already stipulated that it is an employer and subject to the jurisdiction of OSHA and the Commission. However, with respect to two of the citation items discussed below, Respondent contends none of its employees were exposed to the hazard caused by the alleged violation. Instead, Respondent contends only the loading crew, which was purportedly staffed by independent contractors, was exposed to the hazards imposed by the improperly guarded chop saw and the gap between the loading floor and shipping containers.[9] While Respondent insists the members of the loading crew are independent contractors, the Court finds Respondent exerts sufficient control over the manner and means of their work to establish an employer-employee relationship for the purposes of liability under the Act. The following analysis illustrates this is so regardless of which legal test is applied.

### i. The Commission's *Darden* Factors

Section 3 of the Act defines an *employer* as "a person engaged in a business affecting commerce who has employees" and defines *employee* as "an employee of an employer who is employed in a business of his employer which affects commerce." 29 U.S.C. § 652. Following the lead of the Supreme Court in *Darden*, the Commission determined Congress intended the foregoing terms to "describe the conventional master-servant relationship understood by common law agency doctrine." *See Don Davis d/b/a Davis Ditching and Davis Ditching, Inc.*, No. 96-1378, 2001 WL 856241, at *3 (OSHRC, July 30, 2001) (quoting *Darden*, 503 U.S. at 322-23 (citing *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989)). Whether such a relationship exists

---

[9] The same applies, albeit with less force, to the forklift training item. Respondent's claimed employee, Adam Abdirahman, admitted to, and was observed, driving the forklift. The determination that the loading crew were employees only affects the determination of how many employees were exposed to the hazard posed by an inadequately trained forklift operator. This, in turn, impacts the assessment of probability in the gravity-based penalty determination.

depends on the "hiring party's right to control the manner and means by which the product is accomplished." *Darden*, 503 U.S. at 323. The Court identified the following factors as relevant to the inquiry of control:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 323-24. This list does not come with a formula: "'[A]ll of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Id.* at 324 (quoting *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968)). As with all elements of Complainant's prima facie case, it is her burden to prove Respondent was the employer of the loading crew. *See FreightCar Am.*, No. 18-0970, 2021 WL 2311871, at *2-3, (OSHRC, Mar. 3, 2021) (emphasizing Complainant has burden to establish employment relationship).

The first *Darden* factor is an assessment of the skill required to do the job in question. Respondent makes much of the fact that the loading crew decides whether a particular set of four vehicles can fit within a shipping container or not, as if to suggest there is a level of specialization inherent in making that determination. The record, however, is not particularly clear as to how the loading crew specifically loaded, positioned, or suspended[10] the cars such that the process itself illustrates the need for an unusual level of skill. What the Court understands of the process is that it involves loading multiple cars into shipping containers using forklifts, wire cable cut to size with a chop saw, two-by-four blocks, and drill/screw guns. Ultimately, the Court finds this factor tends in favor of an employer-employee relationship.

---

[10] The incident leading to the inspection in this case reveals that vehicles were, in part, suspended within the shipping containers to, presumably, allow for greater capacity.

In particular, the Court notes Vasquez's testimony in response to cross-examination regarding whether Respondent exerted control over how they worked:

> Q. And Prime did not control how you went about loading the vehicles in the container, correct?
> A. No, but they would tell us how they wanted them specifically.
> Q. Okay. But for example Mr. Salem did not tell you how much lumber was required, correct?
> A. No.
> Q. And regarding the actual inspection where the compliance officer was interviewing you, did the compliance officer ever ask you whether Prime had control over your job duties?
> A. Not control but they would tell us specifically how to prepare the base. I don't know what officer your [sic] referring to.

(Tr. 123). This colloquy reveals the opposite, perhaps, of what Respondent intended to elicit. While Vasquez tried to disclaim control and responded in the negative when asked about whether Salem dictated the amount of lumber required for a given job, he simultaneously pointed out that Respondent would: (1) tell the loading crew how he wanted the vehicles in the container; and (2) how Respondent expected the base to be constructed. Thus, the loading crew's exercise of judgment was bounded literally, and figuratively, by the restrictions imposed by Respondent's specifications for loading and base construction. *See, e.g., Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1312 (5th Cir. 1976) (finding laundry operators "[had] no viable economic status that can be traded to other [] companies and the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence"). This suggests two things. First, if we assume Respondent showed them how to prepare the bases for loading cars at the beginning of their employment as a matter of practice and procedure, then this counts against a finding of independent contractor status in two ways: (a) the work itself does not require a level of specialization and sophistication associated with independent contractor status; and (b) the restrictions imposed by creating the base according to Respondent's specifications will limit the

ability of any crew, specialized or not, to fit vehicles of varying sizes into a box with set dimensions. Neither of these facts suggest significant independent decision-making on the crew's behalf or significant skill in the implementation. Rather, these facts indicate Respondent maintains significant control over the process by specifying how the base for the loaded vehicles must be created and how the cars should be loaded in the container. Alternatively, if Respondent shows the crew how to load the cars and prepare the base for each individual container and/or vehicle, this suggests an even greater level of control over the process on behalf of Respondent, lack of specialization on behalf of the crew, and even less evidence of the crew's exercise of independent judgment.

The second and third factors consider the source of the tools and instruments and the location of the work. Every workday, which Vasquez estimates at roughly 5-6 days per week, the loading crew goes to Respondent's workplace to load cars in the same location. Respondent provides all the tools, equipment, and materials required to perform the job of loading the cars. (Tr. 121). There is no evidence any member of the loading crew brought any tools to the loading dock.

In an attempt to undercut the significance of these facts, Salem testified he takes deductions from the individual loading crew members' paychecks for their use of the tools, equipment, and materials necessary for loading. These deductions, he testified, are a product of his initial negotiation with each of the loading crew members and purportedly indicate they are independent contractors. (Tr. 150). The Court does not find Salem's testimony persuasive. First, Respondent never produced documentation reflecting such deductions were occurring. (Tr. 152). Nor did Respondent provide, prior to trial, any other evidence or testimony that such deductions were

occurring. Second, Salem could not credibly testify how much the deductions were for,[11] what equipment and materials it applied to, or how this was negotiated. Instead, he relied upon "the advice of his accountant" but provided no other evidence to corroborate such a claim. Third, the Court is not convinced these deductions, as applied by Respondent, indicate an independent contractor relationship even if they happened. Salem testified as if the "hiring" process was a complex negotiation, which purportedly included a discussion of the aforementioned deductions; however, even though he allegedly negotiated these deals, he could not explain the details of these negotiations and said his accountant handled it.

Vasquez, on the other hand, merely testified he was referred to Salem by a friend and was told he would be given an opportunity to work. (Tr. 119). There was no mention of any negotiation, contract, or paperwork other than a 1099-NEC form, which Vasquez appeared unfamiliar with. (Tr. 124). To the extent these deductions were occurring, the Court finds they were neither the result of a complex negotiation nor indicative of an independent contractor arrangement.

The remaining factors can be addressed in more summary fashion, which the Court will organize according to whether they indicate an employer-employee relationship. The following, as with the above factors, support a finding Respondent is the employer of the loading crew. First, the work the loading crew performed is the basic function of Respondent's business—fulfilling orders and loading shipping containers with vehicles. As to the duration of the relationship, it varied depending on the worker. Vasquez testified he worked exclusively for Respondent for approximately a year-and-a-half; however, the other gentlemen worked for Respondent for less time. (Tr. 119, 142). Nevertheless, during that year-and-a-half, Vasquez worked exclusively for

---

[11] Salem testified at one point that he would deduct "like 10 percent" for the use of the forklift; however, given the lack of any corroboration, coupled with his otherwise equivocal testimony on this topic, the Court finds such testimony is entitled to little weight.

Respondent five to six days per week for forty hours or more. (Tr. 119). In addition to being his exclusive employer, Respondent required Vasquez to provide notice when he needed to take time off work. (Tr. 121). There was no direct evidence that Respondent had the authority to assign other jobs; however, Vasquez testified that, when he was not loading cars, he was prepping materials to do so. (Tr. 110).

The list of factors tending towards proof of an independent contractor arrangement is small and, in some cases, equivocal. Vasquez testified the loading crew was initially paid with checks, but then Respondent switched to paying electronically through Zelle. The parties did not provide the Court with pay stubs or any other documentation regarding how, when, or in what manner they were paid other than through the testimony of Vasquez and Salem. As such, this factor is equivocal or slightly tends towards an independent contractor relationship. There was no testimony regarding benefits, and the only evidence of tax treatment is a singular 1099-NEC form that was filled out for Vasquez, who did not understand its significance. Much like the form of payment, this tends towards an independent contractor arrangement, but only at a surface level.

At bottom, the *Darden* factors are concerned with the question of *control*. *Darden*, 503 U.S. at 323 (holding determination of whether an employer-employee relationship exists depends on the hiring party's right to control the manner and means by which the product is accomplished"). The foregoing illustrates Respondent controls the what, when, where, and how of the loading crew's work: The work performed by the loading crew is the core of Respondent's business. Respondent dictated which cars would be loaded into a particular container and how the loading crew needed to construct the "base" to load them according to the shipping list. The small areas of apparent control or independence highlighted by Respondent—like the crew reporting it could not fit the cars as specified—are little more than artifice. *Pilgrim Equip.*, 527 F.2d at 1312

("[L]ack of supervision of the individual over minor regular tasks cannot be bootstrapped into an appearance of real independence.").

So, too, the Court finds, is Salem's testimony that he was making equipment- and tool-based deductions from the loading crew's pay. The fact that Salem gave virtually no specifics regarding how the employees were paid or how those deductions were made, even though he was purportedly a party to their negotiation, renders his testimony even less credible. The Court refuses to accord this testimony much weight without some corroboration. Respondent had the opportunity to provide documentation, such as the 1099-NEC form, to counter Complainant's prima facie case of an employer-employee relationship but failed to do so. Even if the deductions were occurring as represented by Salem, the Court finds the other factors discussed above illustrate Respondent exerts a sufficient level of control over the conditions of the loading crew's employment to qualify him as their employer for the purpose of coverage under the Act.

ii. The Fifth Circuit's "Economic Realities" Test

The Fifth Circuit applies a slightly different analysis to the question of whether a worker is an employee or independent contractor.[12] *See Kerns Bros. Tree Serv.*, No. 96-1719, 2000 WL 294514, at *4 (OSHRC, Mar. 16, 2000) ("Where it is highly probable that a Commission decision [will] be appealed to a particular circuit, the Commission has generally applied the precedent of that circuit in deciding the case — even though it may differ from the Commission's precedent."). The circuit court frames the question in this way: "whether the alleged employees, as a matter of 'economic reality,' are 'economically dependent' on the business to which they supply their labor and services"? *See Parrish v. Premier Directional Drilling LP*, 917 F.3d 369, 379 (5th Cir. 2019)

---

[12] The cases cited by Complainant are actually FLSA cases; however, the FLSA defines employee in the exact same manner as the OSH Act. Accordingly, the Court finds the Fifth Circuit would likely apply a similar analysis.

14

(quoting *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1045 (5th Cir. 1987). Like *Darden*, the Fifth Circuit uses a non-exhaustive list of factors to make this determination. *See id.* (citing *United States v. Silk*, 331 U.S. 704 (1947)). They include:

> (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship"

*Id.* at 379. The circuit court was careful to note, "Control is only significant when it shows an individual exerts such control over a meaningful part of the business that [the individual] stands as a separate economic entity." *Id.* at 381. Thus, the court cautioned, "[L]ack of supervision [of the individual] over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Id.*

Much of this has already been addressed in the previous section, and the change in law does not mandate a change in result. The Court previously found Respondent exerted substantial control over the most significant aspects of the loading crew's employment. For those tasks where Respondent contends loading crew members were in control, the Court finds the loading crew's sphere of control was minor and their discretion was fairly well circumscribed by the specifications imposed by Respondent. For the same reasons, the Court finds the level of skill and initiative required to perform the job did not reveal an independent contractor relationship. As noted above, the loading crew was told how to prepare the base upon which the cars rested and which cars were supposed to go in a particular container. Given these parameters, there was not a lot of room for discretion or initiative.

The next two factors address financial considerations, such as the relative investments of the parties and whether the putative employees' opportunity for profit/loss is determined by the employer. The loading crew members bring little more than their labor, in terms of investment in

the enterprise. Further, the Court is unconvinced the material and equipment deductions claimed by Salem were actually occurring. Even if they were, the Court finds these are illustrative of Respondent's control rather than a conscious investment by the laborers. Along those same lines, Vasquez's testimony was clear that he worked exclusively for Respondent for a year-and-a-half; he worked 40 hours per week for five-to-six days per week; and had to provide notice if he needed to take time off. Regardless of how Respondent wishes to characterize the members of the loading crew on paper, the economic reality of their situation reveals the hallmarks of an employer-employee relationship.

Accordingly, under either test, the Court finds Respondent is the employer of Vasquez and the other members of the loading crew for the purposes of establishing liability under the Act.

### C. Citation 1, Item 1

The CSHO cited Respondent for a serious violation of 29 C.F.R. § 1910.28(b)(3)(i), which provides:

> The employer must ensure each employee is protected from falling through any hole (including skylights) that is 4 feet (1.2 m) or more above a lower level by one or more of the following . . .covers; guardrail systems; travel restraint systems; or personal fall arrest systems.

Complainant alleges Respondent's employees were "exposed to fall hazards greater than 4 feet when loading shipping containers that did not have dock plates or a fall protection system between the bay and the container." *Citation* at 7.

Respondent's principal argument to this and the other violations was that Respondent did not expose any of its employees to the hazards alleged. Rather, the only people exposed to a hazard were the purported independent contractors. Because the Court has determined the members of the loading crew were employees, the Court summarily rejects this argument as to each of the alleged

16

citation items. Further, the Court will, from this point forward, refer to all members of the loading crew as employees of Respondent.

### i. The Standard Applies

To determine whether the cited provision applies to the cited condition, the Court first considers "the text and structure of the standard at issue." *Superior Masonry Builders, Inc*, No. 96-1043, 2003 WL 21525277, at *2 (OSHRC, July 3, 2003). The standard's plain language will govern if the wording is unambiguous. *Id.*; see also *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976) (noting well-established principle that a "regulation should be construed to give effect to the natural and plain meaning of its words").

There is no serious dispute the standard applies. Respondent disputed the space between the container and the loading dock was a "hole", characterizing it instead as a "gap". Irrespective of semantics, the Act defines a hole as a "gap or open space in a floor, roof, horizontal walking-working surface, or similar surface that is at least 2 inches (5 cm) in its least dimension." 29 C.F.R. § 1910.21. As illustrated by the measurements supplied by CSHO Cabello and his cohort, the gap between the container and the dock floor was approximately 8 inches in its least dimension, qualifying it as a hole under the Act. Further, since the hole was also more than four feet above the ground, it was therefore incumbent upon Respondent to ensure one of the enumerated abatement measures was implemented.

### ii. The Standard was Violated

The testimony of Vasquez and the surveillance video procured by CSHO Cabello show the standard was violated. Both Salem and Vasquez testified Respondent had a dock plate on the premises, which is one of the listed abatement measures within the cited standard. Nevertheless, both Vasquez and Salem testified they typically did not use the plate unless the profile of the car

17

was too low to span the gap or there was a height difference between the container and the floor. Otherwise, as the video shows, employees would walk or drive forklifts across the eight-inch gap while loading vehicles onto the shipping container. The standard was violated.

### iii. Respondent's Employees Were Exposed to the Hazard

Aside from the question of whether Complainant proved an employee-employer relationship, Respondent places unnecessary emphasis on ancillary details, such as when the violations/hazards were observed by CSHO Cabello or whether anyone has been hurt while performing work in this manner. First, there is no serious question that loading dock employees were crossing the threshold of the dock onto the trailer of the semi-truck without the use of a dock plate, as shown in video, photographic, and testimonial evidence. (Ex. C-7). As noted by Complainant, when CSHO Cabello physically observed the worksite, it was left in the same condition as it was prior to the fatal incident. (Tr. 54). Second, the purpose of the Act is to prevent the first accident. Whether anyone was ever hurt while working under the conditions present here is irrelevant to the question of whether Complainant established exposure to a hazard or whether the standard was violated. *Consol. Aluminum*, No. 77–1091, 1980 WL 10718 (OSHRC, Dec. 19, 1980) (absence of injuries does not preclude finding of exposure when existence of hazard is established by objective facts).

### iv. Respondent was Aware of the Hazardous Condition

The gap between the floor and the shipping container was an open, obvious, and consistent condition. Respondent's primary business is shipping cars internationally. To do this, Respondent's workplace contains a loading dock. (Tr. 99; Ex. C-2a). The dock has a series of bays, each of which is equipped with two substantial rubber bumpers designed to prevent the semi-trucks from backing the trailer/container into the dock floor and causing damage. The presence of those

bumpers, by necessity, creates a gap between the dock floor and the shipping container to be loaded. Salem was aware of this. (Tr. 138). Salem was also aware that his employees did not use the dock plate as a matter of practice, but only "when it is necessary". (Tr. 130, 138-39).

Respondent contends it never determined when a ramp would be necessary because it did not have employees performing this work. First, as already established, Respondent had employees performing this work. Second, the Court does not find it credible that someone with Respondent's lengthy experience, whose primary business is loading cars onto shipping containers from a warehouse, is unaware of the need for a dock plate to ford the gap created by the rubber bumpers. This is especially so given Respondent owned a dock plate, had an office close to the loading dock, and was aware of his employees' practice (or at least his own). (Tr. 61-62, 132-33; Ex. C-7).

Respondent cannot disclaim responsibility for the safety of these employees by attempting to characterize them as independent contractors given the level of control he asserts over the conditions of their employment. As an employer, Respondent is obligated to provide safe working conditions and ensure safe work practices. Implicit in that obligation is the requirement to inspect the workplace and correct unsafe working conditions. *Wiley Organics, Inc. d/b/a Organic Tech.*, No. 91-3275, 1996 WL 139738, at *12 (OSHRC, Mar. 25, 1996), *aff'd*, 124 F.3d 201 (6th Cir. 1997) ("An employer has a general obligation to inform itself of the hazards present at the worksite and cannot claim lack of knowledge resulting from its own failure to make use of the sources of information readily available to it."). Failing to conduct inspections does not absolve an employer of damaging knowledge it would otherwise have gained. Rather, the failure to conduct inspections when such inspections would have revealed a hazard is akin to sticking your head in the sand and mandates the same result as if Respondent was directly aware of the hazard. Accordingly, the

Court finds Respondent knew or, with the exercise of reasonable diligence, could have known of the hazardous condition.[13]

## v. The Violation Was Serious

Finally, the Court finds the violation was serious. Under section 17(k) of the Act, 29 U.S.C. § 666(k), a violation is serious where there is a "substantial probability that death or serious physical harm could result" from the cited condition. *See Manganas Painting Co., Inc.*, No. 94-0588, 2007 WL 6113032, at *14 n.20 (OSHRC, March 23, 2007). According to CSHO Cabello, the unprotected hole between the shipping containers and the dock floor exposed Respondent's employees to trips and falls, which could result in lacerations and/or fractures. (Tr. 66). The potential for such injuries renders the violation serious. Accordingly, Citation 1, Item 1 is AFFIRMED.

### D. Citation 1, Item 3

The CSHO cited Respondent for a serious violation of 29 C.F.R. 1910.178(l)(1)(i), which provides:

> The employer shall ensure that each powered industrial truck operator is competent to operate a powered industrial truck safely, as demonstrated by the successful completion of the training and evaluation specified in this paragraph (l).

Complainant alleges none of the employees operating the Doosan Model G55C-7 forklift had received proper forklift training. *Citation* at 9.

---

[13] It is unclear if Respondent was claiming it could not be charged with knowledge because it was unaware the condition violated the Act; however, it is immaterial whether Respondent was unaware the condition violated the Act. *Peterson Bros. Steel Erection Co.*, No. 90-2304, 1993 WL 155696, at *4 (OSHRC, Apr. 27, 1993) ("The knowledge element of a violation does not require a showing that the employer was actually aware that it was in violation of an OSHA standard; rather it is established if the record shows that the employer knew . . . of the conditions constituting a violation."), *aff'd*, 26 F.3d 573 (5th Cir. 1994).

### i. The Standard Applies

Section 1910.178(a)(1) states the cited section contains safety requirements "relating to fire protection, design, maintenance, and use of fork trucks, tractors, platform lift trucks, motorized hand trucks, and other specialized industrial trucks powered by electric motors or internal combustion engines." 29 C.F.R. § 1910.178(a)(1). It specifically excludes "compressed air or nonflammable compressed gas-operated industrial trucks, nor to farm vehicles, nor to vehicles intended primarily for earth moving or over-the-road hauling." *Id.* The Court finds the standard applies.

### ii. The Standard was Violated

To qualify an employee as a powered industrial truck operator, an employer must ensure the employee goes through a training program that meets the requirements of paragraph (l). *See* 29 C.F.R. § 1910.178(l)(1)(i). The requirements of paragraph (l) are extensive. First, the standard indicates what is required to implement the program, including (1) direct supervision by a person with adequate training, knowledge, and experience; (2) a safe space to practice; and (3) a combination of formal instruction, practical training, and evaluation. *Id.* § 1910.178(l)(2). Second, the standard sets forth twenty-two separate content areas that address the specifics of the truck to be driven and the location where it will be driven. *See id.* § 1910.178(l)(3).

During his inspection, CSHO Cabello saw both Salem and Adam Abdirahman operate a forklift without wearing a seatbelt, which caused him to inquire further into Respondent's training program. As it turned out, three different individuals operated forklifts at Respondent's facility, and there is no evidence any of them have received proper training according to the standard. One of the principal requirements is for the trainee to be instructed by a person with "adequate training,

21

knowledge, and experience." *Id*. Salem testified he learned how to drive a forklift while employed as an office worker at a previous job. (Tr. 147). According to Salem, however, he only received the practical component of his training. (Tr. 148). He did not receive the required instructional/classroom component, and there is no evidence that his skills were evaluated at the conclusion of his training. (Tr. 148). Further, Salem did not receive a certification as required by § 1910.178(l)(6). Salem's lack of certification and training is sufficient, in and of itself, to find a violation of the standard; however, there are two additional bases upon which to find a violation.

Even if the Court were to assume Salem was qualified to provide training—it does not— the Court would nonetheless find Respondent's employees were not properly trained to operate the forklifts at Respondent's facility. During the inspection, one of Respondent's claimed employees, Adam Abdirahman, told CSHO Cabello he received hands-on, practical training from Salem but did not receive formal, classroom-style training. (Tr. 69, 74). Abdirahman also told CSHO Cabello he had not been evaluated as a driver, and he did not receive certification as a driver. (Tr. 73-74). Respondent could not provide evidence of a forklift training program, documentation that training had occurred, or certification that training had been completed. (Tr. 71, 73, 148-49, 150). The cited standard is specific as to what is required to become a qualified forklift operator, of which practical training is only a part. As such, Respondent's training does not comply with the requirements of the cited standard.

In addition to the foregoing, the Court also finds Respondent failed to properly train or assess Vasquez's abilities as a forklift operator. Respondent contends Salem knew Vasquez was qualified based on prior experience and contends there was no requirement for it to conduct further inquiry into Vasquez's qualifications. Respondent is incorrect. According to § 1910.178(l)(5), an employer can avoid providing unnecessary training to an employee who has previously been

22

trained under similar conditions using similar vehicles. However, the employer is required to ensure the employee in question has been evaluated and found competent to operate the truck safely. In other words, it is incumbent on Respondent to ensure Vasquez was trained in accordance with the requirements of § 1910.178(l). Other than testifying that he had observed Vasquez operate a forklift in a previous job, there is no evidence Respondent conducted an evaluation of Vasquez's skills that would reveal training that was compliant with the standard. (Tr. 149-150).

Based on the foregoing, the Court finds Complainant proved the terms of the standard were violated.

### iii. Respondent's Employees Were Exposed to the Hazard

CSHO Cabello testified he observed Salem and Abdirahman operating forklifts during this inspection, and the surveillance video from the day of the incident reveals that Vasquez also operated the forklift around Respondent's worksite. (Tr. 135; Ex. C-7, R-5). The forklifts operated near employees on foot, who were setting up the bases inside the shipping containers. (Ex. C-7, R-5). According to CSHO Cabello, operating a forklift without proper training on the specific forklift and work area exposes employees on foot, as well as the operators themselves, to crushing and struck-by injuries. (Tr. 71). This is especially true when the operator is not wearing a seatbelt, as was the case here. The Court agrees with Complainant's assessment and finds Respondent's employees were exposed to crushing and struck-by injuries when working in proximity to improperly trained forklift operators.

### iv. Respondent was Aware of the Hazardous Condition

The standard makes it clear that it is the employer's responsibility to ensure its employees are properly trained. *See* 29 C.F.R. § 1910.178(l)(1)(i) ("*The employer shall ensure* that each powered industrial truck operator is competent . . . .") (emphasis added). There is no serious dispute

that Respondent was aware of its own failure to provide adequate training to its employees. Salem testified he provided on-the-job training to Abdirahman but did not provide formal, classroom style training; did not have a formal training program; did not have compliant training himself; and failed to certify that either Abdirahman or Vasquez were trained and competent in the areas identified in § 1910.178(1). Accordingly, the Court finds Respondent was aware of the hazardous condition.

### v. The Violation Was Serious

According to CSHO Cabello, the potential injuries to which Respondent's employees were exposed included lacerations, fractures, and even death. (Tr. 71). Respondent only argued that no one had been hurt on Respondent's worksite due to a forklift accident. As noted above, it is immaterial whether someone has been hurt in the past. Through the notice and comment process, OSHA determined the failure to properly train employees in the operation of a forklift can create significant hazards to the operator and those around them. *See* Powered Industrial Truck Operator Training, 63 Fed. Reg. 66,238, 66,249 (Dec. 1, 1998) (to be codified at 29 C.F.R. pts. 1910, 1915, 1917, 1918 and 1926). Simply because it has not happened yet only means Respondent has been fortunate. It does not negate the existence of a serious hazard. Accordingly, Citation 1, Item 3 is AFFIRMED.

#### E. Citation 1, Item 4

The CSHO cited Respondent for a serious violation of 29 C.F.R. § 1910.212(a)(3)(ii), which provides:

> The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

Complainant alleges Respondent's employees bypassed a guard on a DeWalt chop saw that was used to cut the 3/8" wire rope for securing the vehicles inside the shipping containers. *Citation* at 10. The Court finds Complainant established a violation of the standard.

### i. The Standard Applies and Was Violated

The standard states that "point of operation machines whose operation exposes employees to injury, shall be guarded." 29 C.F.R. § 1910.212(a)(3)(ii). The chop saw in question is a point of operation machine, the operation of which exposes employees to injury. Thus, the standard requires it to be guarded. As illustrated in the photographs taken by CSHO Cabello, the guard was tied back, exposing the chop saw blade. (Ex. C-5). Bypassing the guard in this way is a violation of the standard.

### ii. Respondent's Employees Were Exposed to the Hazard

To establish exposure, Complainant must show "that it is reasonably predictable either by operational necessity or otherwise (including inadvertence), that employees have been, are, or will be in the zone of danger." *Kaspar Wire Works*, No. 90-2775, 2000 WL 1182904 (OSHRC, July 3, 2000)) (quoting *Fabricated Metal Prods.*, No. 93-1583, 1997 WL 694096, at *3 (OSHRC, Nov. 7, 1997)). Thus, the question is whether Complainant established it was reasonably predictable one of Respondent's employees was exposed to the point of operation on the chop saw. The Court finds the weight of the evidence establishes Respondent's employees were exposed to the hazard.

According to CSHO Cabello, the chop saw was located next to the cargo bay door where the crew was loading the shipping container, so it was available for use. (Tr. 80; Ex. C-5). Vasquez and Cabello testified the saw was used daily to chop wire rope to support the cars inside the shipping containers. (Tr. 79, 80, 109-111). Even though wire had been cut that day, Vasquez testified he did not remember who did it, nor does he remember seeing the chop saw with the guard tied up. (Tr. 117). He did not recall ever using it in that position; however, he noted that the guard

needed to be removed to replace the blade. (Tr. 117-118). Otherwise, he testified, the guard was "always down." (Tr. 117). The Court did not hear testimony from any other member of the loading crew.[14]

CSHO Cabello testified that, during the inspection, Salem told him the loading crew had to tie up the guard while cutting the 3/8" wire rope but forgot to put the guard back down. (Tr. 82-83). Salem did not directly dispute this conversation occurred; however, while examined by his counsel at trial, Salem testified the chop saw "was not with hazard to any employees. The people who were using it were contractors, and I have no knowledge of anyone using like that way." (Tr. 130). The Court finds CSHO Cabello's testimony more credible because the majority of his testimony has been corroborated by the record. Salem's testimony, on the other hand, has not always jibed with the facts and, in some cases, appears purposely evasive to avoid the possibility of being characterized as the loading crew's employer.

In *Kaspar Electroplating Corp.*, No. 90-2866, 1993 WL 522462 (OSHRC, Dec. 16, 1993), the Commission was presented with a factual scenario not altogether different from the one at bar. During his inspection, the CSHO observed a bandsaw in the maintenance area with a guard bent upward, exposing 1.5" of the blade. *Kaspar*, 1993 WL 522462, at *3. Ultimately, the Commission found employees had access to the hazard. The band saw in question was used on an as-needed basis, was not tagged out, and the employer did not have rules instructing employees not to use the saw in that condition. *Id.* Further, in light of these facts, the Commission found it irrelevant whether the machine was plugged in at the time of the inspection. *Id.*

---

[14] CSHO Cabello attempted to attribute statements regarding use of the chop saw to "employees"; however, because an adequate foundation was not laid to overcome the hearsay objection, the objection was sustained. The Court did not rely on this statement to reach its conclusion.

Even if there is no direct evidence of a loading crew employee using the chop saw with an improperly stowed guard, the Court finds it is reasonable to conclude Respondent's employees were exposed to the hazard. *See Fluor Daniel*, No. 96-1729, 2001 WL 1117965, at *3 (OSHRC, Sept. 21, 2001) (consolidated) ("[T]he Commission may draw reasonable inferences from the evidence[.]" (citing *Atl. Battery Co.*, No. 90-1747, 1994 WL 682922, at *4 (OSHRC, Dec. 5, 1994)). Complainant presented evidence showing the saw: (1) exposed users to a point of operation hazard while cutting wire rope; (2) was available for use; (3) had been used that day; and (4) was likely to be used again later that day. *See Kaspar*, 1993 WL 522462 at *3. Given the foregoing, in addition to the utter lack of workplace rules or instructions whatsoever, the Court finds "it is reasonably predictable either by operational necessity or otherwise (including inadvertence), that employees have been, are, or will be in the zone of danger." *Kaspar Wire Works*, 2000 WL 1182904, *supra*.

### iii. Respondent Was Aware of the Hazardous Condition

In finding Respondent was aware of the hazardous condition, the Court relies on the testimony of CSHO Cabello, who testified that, during the inspection, Salem told him the saw's guard was pulled back in order to cut the 3/8" rope. (Tr. 82-83). At trial, Salem testified only "contractors" use the saw and that he did not know anyone used it that way. First, the Court has already determined Salem's testimony on this point is not entitled to any weight. Rather, his statement to CSHO Cabello regarding how the rope was cut more closely aligns with Vasquez's testimony that he and the other loading crew members were given specific instructions by Salem about how to construct the bases upon which the vehicles were stored. Second, much like it concluded with respect to the dock plate violation, the Court finds Salem had an obligation to ensure his employees—including the loading crew—were using the saw in a safe manner. There

27

is no indication Respondent had rules in place to ensure safe operation of the equipment, nor was there any evidence to suggest Respondent conducted inspections or walkthroughs of the worksite to ensure safe work practices, let alone compliance.

The fact that Salem told CSHO Cabello the saw was in that condition because that was how it needed to be set to cut the wire rope, which was used throughout the day, is sufficient to illustrate direct knowledge of the condition. Nevertheless, even if the Court did not accept CSHO Cabello's testimony, the Court would still find Respondent's failure to implement rules or inspections of any kind illustrates a lack of reasonable diligence, which, if exercised, would have revealed the condition of the chop saw. Accordingly, Respondent was aware of the condition.

### iv. The Violation Was Serious

CSHO Cabello testified, without contradiction, that the improperly guarded chop saw exposed Respondent's employees to laceration and amputation hazards, which are properly characterized as serious. Based on this and the foregoing, the Court finds Complainant established its prima facie case. Accordingly, Citation 1, Item 4 is AFFIRMED.

### VI. Penalty

Under the Act, the Secretary has the authority to propose a penalty according to Section 17 of the Act. *See* 29 U.S.C. §§ 659(a), 666. The amount proposed, however, merely becomes advisory when an employer timely contests the matter. *Brennan v. OSHRC (Interstate Glass)*, 487 F.2d 438, 441–42 (8th Cir. 1973); *Revoli Constr. Co.*, No. 00-0315, 2001 WL 1568807, at *5 (OSHRC, Dec. 7, 2001). Ultimately, it is the province of the Commission to "assess all civil penalties provided in [Section 17]", which it determines *de novo*. 29 U.S.C. § 666(j); *see also Valdak Corp.*, No. 93-0239, 1995 WL 139505 (OSHRC, Mar. 29, 1995) *aff'd*, 73 F.3d 1466 (8th Cir. 1996) "[T]he Act requires that "due consideration" be given to the employer's size, the gravity

of the violation, the good faith of the employer, and any prior history of violations." *Briones Util. Co.*, No. 10-1372, 2016 WL 742575, at \*4 (OSHRC, Dec. 14, 2016) (citing 29 U.S.C. § 666(j). These factors are not necessarily accorded equal weight. *J.A. Jones Constr.*, No. 87-2059, 1993 WL 61950, at \*15 (OSHRC, Feb. 19, 1993) *(citation omitted)*. Rather, the Commission assigns the weight that is reasonable under the circumstances. *See, e.g., Merchant's Masonry, Inc.*, No. 92-424, 1994 WL 723829, at \*1 (OSHRC, 1994). It is the Secretary's burden to introduce evidence bearing on the factors and explain how he arrived at the penalty he proposed. *Valdak Corp.*, 1995 WL 139505, at \*4. "Gravity is typically the most important factor in determining an appropriate penalty and depends upon the number of employees exposed, the duration of the exposure, the precautions taken against injury, and the likelihood that any injury would result." *See, e.g., Capform, Inc.*, No. 99-0322, 2001 WL 300582, at \*4 (OSHRC March 26, 2001) (citing *J.A. Jones Constr. Co.*, 15 BNA OSHC 2201, 2214, 1991-93 CCH OSHD ¶ 29,964, p. 41,033 (No. 87-2059, 1993)., *aff'd*, 34 F. App'x 152 (5th Cir. 2002) (unpublished).

### A. Citation 1, Item 1

Complainant proposed a penalty of $3,729 for this violation after applying a 70% reduction for the size of Respondent's business. At trial, CSHO Cabello testified he determined the violation exposed three employees to trip and fall hazards as they walked back and forth across the gap between the shipping containers and the dock floor. (Tr. 64-66). Because employees routinely went in and out of the shipping container throughout the workday, they were repeatedly exposed to the hazard, which was likely to cause injuries of medium severity, such as lacerations, bruises, and potentially fractures. The Court agrees with Complainant's gravity-based assessment and finds the assessed penalty to be appropriate.

### B. Citation 1, Item 3

Complainant also proposed a penalty of $3,729 for this violation after applying the same 70% reduction for Respondent's size. (Tr. 73-75). As with the previous item, the Court finds each of Respondent's employees were exposed to the hazard posed by improperly trained forklift operators. Each of Respondent's employees were exposed to severe injuries from being struck by an improperly operated forklift, including fractures and, in some cases, death. Given the lack of proper training or workplace rules, the probability of an accident was increased even further. Based on these assessments, the Court sees no reason to depart from the recommendations of Complainant.

### C. Citation 1, Item 4

Complainant proposed a penalty of $3,108 for this violation after applying a 70% reduction for Respondent's size. The Court agrees with Respondent that three employees were exposed to the point-of-operation hazard caused by the improperly stowed chop saw guard. Like the gap between the dock and the shipping container, this saw was used throughout the day to cut wire rope for storing the cars inside the storage containers. Indeed it was available to any employee who needed to use it, as it was placed right next to the loading bay. This point of operation hazard exposed employees to lacerations and potentially amputation. The Court finds Complainant's gravity-based assessment is appropriate.

### VII. Conclusion

The Occupational Safety and Health Act is designed "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions . . . ." OSH Act of 1970, Public Law 91-596, 84 STAT. 1590, 91st Congress, S.2193, December 29, 1970, as amended through January 1, 2004. As such, the Act casts a broad net in terms of who qualifies as

an "employee" to achieve that goal. Thus, the question of whether a worker is an independent contractor or an employee is not resolved by an IRS tax form or a purported policy of charging workers to use tools the company provides for the job. The *Darden* factors and the economic realities test ultimately focus on two issues: control by the employer and the economic independence of the worker. Respondent exerted control over the hours worked, the availability of other work, and how the work was performed. There was very little independent decision-making by the employees that was not already circumscribed by Respondent's specifications for loading the vehicles, let alone the sort of independence an outside observer would reasonably equate with a person in business for his- or herself.

Because the Act considers the loading crew members to be employees, Respondent has a commensurate duty to ensure they have a safe working environment.[15] A safe working environment requires the creation and implementation of a safety program that tracks the requirements of the Act and an inspection program to ensure those rules are being followed. Respondent possesses neither. The Court finds these and the other failures cataloged at trial by Complainant show Respondent violated the Act as alleged in each of the Citation Items.

**VIII. Order**

The foregoing Decision constitutes the Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. In accordance with those Findings of Fact and Conclusions of Law, it is ORDERED that:

1. Citation 1, Item 1 is AFFIRMED, and a penalty of $3,729 is ASSESSED.

---

[15] Although not at issue in this proceeding, were the loading crew members actually independent contractors, such a characterization would not necessarily absolve Respondent of liability under the Act. *See, e.g., McDevitt Street Bovis, Inc.*, 19 BNA OSHC 1108, 1109-13 No. 97-1918, 2000 WL 35559662, at *2-4 (OSHRC, Sept. 28, 2000) (finding evidence of control where general contractor had "overall authority at the worksite," including authority to demand compliance with safety requirements, stop work and remove subcontractor from site).

2. Citation 1, Item 3 is AFFIRMED, and a penalty of $3,729 is ASSESSED.

3. Citation 1, Item 4 is AFFIRMED, and a penalty of $3,108 is ASSESSED.

**SO ORDERED.**

*/s/ Joshua R. Patrick*

Joshua R. Patrick
First Judge, OSHRC

Date:
Denver, Colorado

# CERTIFICATE OF SERVICE

This is to certify that a copy of the Notice of Decision and Decision and Order was sent electronically to the parties listed below on January 17, 2025:

Aletsey Z. Hinojosa, Esq.
Michael D. Schoen, Esq.
U.S. Department of Labor
Office of the Solicitor
525 S. Griffin Street, Suite 501
Dallas, Texas 75202
hinojosa.aletsey.z@dol.gov
schoen.michael@dol.gov
docket.dallas@dol.gov

Patrick C. Bates, Esq.
Philip J. Nolen, Esq.
P. Bates Law, PLLC
711 West Bay Area Boulevard, Suite 232
Houston, Texas 77598
patrick@pbateslaw.com
philip@pbateslaw.com
judy@pbateslaw.com

*/s/ Kate Sydney*

Kate Sydney
Legal Assistant
Judge Joshua R. Patrick
U.S. Custom House
OSHRC
721 19th Street, Suite 407
Denver, Colorado 80202
(303) 844-2284
(303) 844-3759 – Fax
ksydney@oshrc.gov



**EXHIBIT B**

UNITED STATES OF AMERICA
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

MARTIN J. WALSH, Secretary of )
Labor, United States Department of Labor )
                                   )
       Complainant, )
                                     )
v. )  OSHRC Docket No.  23-0152
                                     )
PRIME INTERNATIONAL SHIPPING LLC. )  Inspection No. 1607807
and its Successors, )
                                     )
       Respondent. )

---

## RESPONDENT'S PETITION FOR DISCRETIONARY REVIEW

---

Pursuant to Commission Rule 91, 29 C.F.R. § 2200.91(b), Respondent Prime International Shipping LLC ("Prime"), petitions the Occupational and Safety and Health Review Commission for review of the Administrative Law Judge's decision in this case.

### STATEMENT OF PORTIONS OF THE DECISION AND ORDER TO WHICH EXCEPTION IS TAKEN

1.1    Prime takes exception to the portion of the Decision and Order wherein the Administrative Law Judge held the cited standard applies to Prime. Prime takes exception to the portion of the Decision and Order wherein the Administrative Law Judge held Prime's loading crew workers were employees. (Judge's Decision at pages 8-16).[1]

---

[1]   *See Barrera v. E.I. Du Pont de Nemours & Co.*, 653 F.2d 915, 920 (5th Cir. Unit A 1981) (explaining "OSHA does not create duties between employers and invitees, only between employers and their employees…"); *see also Taylor Diving & Salvage Co., Inc. v. U.S. Dep't of Labor*, 599 F.2d 622, 625 (5th Cir. 1979) (explaining "[w]hen adopting OSHA, Congress deliberately sought to achieve job safety while maintaining proper **employee-employer relations**.") (emphasis added).

1

1.2     Prime takes exception to the portion of the Decision and Order wherein the Administrative Law Judge held Prime in serious violation of the standard published at 29 C.F.R. § 1910.28(b)(3)(i) as alleged in Serious Citation 1, Item 1, in finding that Prime's employees were exposed to the alleged violation. (Judge's Decision at pages 17-20).

1.3     Prime takes exception to the portion of the Decision and Order wherein the Administrative Law Judge held Prime in serious violation of the standard published at 29 C.F.R. § 1910.28(b)(3)(i) as alleged in Serious Citation 1, Item 1, in finding that Prime had actual or constructive knowledge of the alleged hazardous condition. (Judge's Decision at pages 18-21).

1.4     Prime takes exception to the portion of the Decision and Order wherein the Administrative Law Judge held Prime in serious violation of the standard published at 29 C.F.R. § 1910.212(a)(3)(ii) as alleged in Serious Citation 1, Item 4, in finding that Prime's employees were exposed to the alleged violation. (Judge's Decision at pages 25-29).

1.5     Prime takes exception to the portion of the Decision and Order wherein the Administrative Law Judge held Prime in serious violation of the standard published at 29 C.F.R. § 1910.212(a)(3)(ii) as alleged in Serious Citation 1, Item 4, in finding that Prime had actual or constructive knowledge of the hazardous condition. (Judge's Decision at pages 29-30).

<u>**STATEMENT OF REASONS FOR WHICH EXCEPTIONS ARE TAKEN**</u>

2.1     In the Decision, the Administrative Law Judge failed to properly consider the economic realities test set forth for the Fifth Circuit's decision in *Brock v. Mr. W. Fireworks, Inc.*, 545 F.3d 338, 343 (5th Cir. 1987) and the United States Supreme Court's test in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992), for determining whether a worker is an employee or independent contractor. The testimony at transcript pages 123 and 133-135 clearly shows Mr. Vasquez was not an employee but instead was an independent contractor.

2.2     The evidence of record supports Prime's position that no workers were exposed to any hazardous condition as alleged in Serious Citation 1, Item 1. The testimony at transcript pages 90-91 shows Compliance Officer Cabello cited Prime for violations on July 12, 2022 but did not inspect the property on July 12, 2022 – instead he inspected the property on July 13 and 14, 2022 (Q. And so you didn't inspect this property on July 12th though, correct? A. No, I did not.).

2.3     The evidence of record supports Prime's position it did not have any actual or constructive knowledge of any alleged hazardous condition as alleged in Serious Citation 1, Item 1. The testimony at transcript page 113 shows Mr. Vazquez confirming Mr. Salem did not determine when a ramp would be needed (Q. Did Mr. Salem determine when a ramp would be needed? A. No.).

2.4     The evidence of record supports Prime's position that no workers were exposed to any violation as alleged in Serious Citation 1, Item 4. The testimony at transcript pages 95-96 clearly shows Mr. Cabello – the compliance officer – saw no workers utilizing the alleged unguarded chopsaw (Q. When you inspected the property did you see anybody actually operate the chopsaw? [Compliance Officer Cabello]. No, sir.). Mr. Vasquez also admits to not using the chopsaw on July 12th, 2022 at trial transcript page 125 (Q. And on July 12th, 2022, do you recall actually using the chopsaw yourself? A. No.).

2.5     The evidence of record supports Prime's position it did not have any actual or constructive knowledge of any alleged hazardous condition as alleged in Serious Citation 1, Item 4. The testimony at transcript page 140 shows Mr. Salem – Prime's owner – did not know why the chopsaw guard was removed (Q. Do you know why the guard was tied up on July 12, 2022? A. No.) and no employees used the chopsaw (Q. Do any of Prime's employees use the chopsaw? A. No.). In fact, Mr. Salem confirms only independent contractors use the chopsaw (Q. Is it just the independent contractors who use the chopsaw. A. Yes.).

**CONCLUSION**

For the foregoing reasons, Prime submits that the Occupational Safety and Health Review

Commission should direct review of the Decision and Order of the Administrative Law Judge.

Respectfully submitted,

P. BATES LAW, PLLC

By: */s/Patrick C. Bates*_____
    Patrick C. Bates
    State Bar No. 24068882
    Federal ID No.  2014055
    Philip J. Nolen
    State Bar No. 24109529
    Federal ID No. 3416086
    711 W. Bay Area Blvd., Suite 675
    Houston, Texas 77598
    Ph:   (713) 487-8660
    Fax:  (346) 502-3571
    Email: patrick@pbateslaw.com
    Email:  philip@pbateslaw.com

    ATTORNEYS FOR RESPONDENT

**CERTIFICATE OF SERVICE**

I certify that I served a true and correct copy of the foregoing instrument on all counsel of record in accordance via e-mail and/or USPS Express Mail and/or filing with the OSHRC E-File System on February 13, 2025 including the below.

Aletsey Z. Hinojosa
U.S. Department of Labor
Office of the Solicitor
525 S. Griffin Street, Room 501
Dallas, Texas 75202
Telephone: (972) 850-3154
Email: hinojosa.aletsey.z@dol.gov; and docket.dallas@dol.gov

Michael D. Schoen
U.S. Department of Labor
Office of the Solicitor
525 S. Griffin Street, Room 501
Dallas, Texas 75202
Telephone: (972) 850-3145
Cell: (202) 594-6077
Email: schoen.michael@dol.gov; and docket.dallas@dol.gov

Executive Secretary
Occupational Safety and Health Review Commission
1120 20th St., N.W., Suite 980
Washington, D.C. 20036-3419

Louise M. Betts, Counsel for Appellate Litigation
Heather R. Phillips, Counsel for Appellate Litigation
Office of the Solicitor, U.S. DOL
Room S4004 200 Constitution Avenue, N.W.
Washington, D.C. 20210

*/s/Patrick C. Bates*_____
Patrick C. Bates

EXHIBIT
C



United States of America
**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**
1120 20th Street, N.W., Ninth Floor
Washington, DC 20036-3457

Office of the
Executive Secretary

Phone: (202) 606-5400
Fax:     (202) 606-5050

---

SECRETARY OF LABOR,

      Complainant,

      v.

PRIME INTERNATIONAL SHIPPING, LLC,

      Respondent.

:
:
:
:
:
:
:
:
:
:
:

OSHRC Docket No. 23-0152

---

## NOTICE OF FINAL ORDER

    The Respondent's Petition for Discretionary Review in the above cited action was received by the Commission on February 13, 2025. The case was not directed for review. **Therefore, the decision of the Administrative Law Judge became a final order of the Commission on February 28, 2025.** Commission Rules 90(b)(2) and 90(d), 29 C.F.R. §§ 2200.90(b)(2) and 2200.90(d); Section 12(j) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 661(j).

    **ANY PERSON ADVERSELY AFFECTED OR AGGRIEVED WHO WISHES TO OBTAIN REVIEW OF THE DECISION OF THE ADMINISTRATIVE LAW JUDGE MUST FILE A PETITION FOR REVIEW WITH THE APPROPRIATE FEDERAL COURT OF APPEALS WITHIN 60 DAYS OF THE DATE OF THE ABOVE FINAL ORDER DATE.** *See* Section 11 of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 660; Fed. R. App. P. 15.

FOR THE COMMISSION,

Dated: March 3, 2025

John X. Cerveny
Executive Secretary

DOCKET NO. 23-0152

NOTICE IS GIVEN TO THE FOLLOWING:

Louise M. Betts, Counsel for Appellate Litigation
Heather R. Phillips, Counsel for Appellate Litigation
Office of the Solicitor, U.S. DOL
200 Constitution Ave., NW, Room S4004
Washington, DC 20210

John Rainwater, Regional Solicitor
Aletsey Zuria Hinojosa, Attorney
Michael D. Schoen, Attorney
Office of the Solicitor, U.S. DOL
525 S. Griffin Street, Room 501
Dallas, TX 75202

Patrick C. Bates, Esq.
Philip J. Nolen, Esq.
P. Bates Law, PLLC
711 West Bay Area Blvd., Suite 232
Houston, TX 77598

Joshua R. Patrick, Administrative Law Judge
Occupational Safety and Health Review Commission
United States Custom House
721 19th Street, Room 407
Denver, CO 80202