No. 25-60182

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

## PRIME INTERNATIONAL SHIPPING, L.L.C.,

Petitioner,

v.

## OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION; LORI CHAVEZ-DEREMER, SECRETARY, U.S. DEPARTMENT OF LABOR,

Respondents.

On Petition for Review of a Final Order of the Occupational Safety & Health Review Commission (Administrative Law Judge Joshua R. Patrick)

## <u>BRIEF OF RESPONDENT SECRETARY OF LABOR</u>

JONATHAN L. SNARE
Acting Solicitor of Labor

LAUREN GOODMAN
Acting Associate Solicitor of Labor for
Occupational Safety and Health

LOUISE M. BETTS
Counsel for Appellate Litigation

DANIEL M. MOCZULA
Attorney
U.S. Department of Labor
201 Varick Street RM 983
New York, NY 10014
202-693-5443

July 25, 2025

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Occupational Safety and Health Review Commission

- John X. Cerveny, Executive Secretary
- Joshua R. Patrick, Administrative Law Judge

Department of Labor

- Lori Chavez-Deremer, Secretary of Labor
- Jonathan L. Snare, Acting Solicitor of Labor
- Seema Nanda, Former Solicitor of Labor
- Lauren Goodman, Acting Associate Solicitor for Occupational Safety and Health
- John Rainwater, Former Regional Solicitor of Labor
- Lindsay A. Wofford, Regional Counsel for OSHA
- Louise Betts, Counsel for Appellate Litigation
- Aletsey Z. Hinojosa, Trial Attorney
- Daniel Moczula, Appellate Attorney

Petitioner

- Prime International Shipping, LLC
- Patrick C. Bates, Attorney for Petitioner
- Philip J. Nolen, Attorney for Petitioner

s/ Daniel Moczula
Attorney of Record for U.S. Department of Labor

## STATEMENT REGARDING ORAL ARGUMENT

The Secretary believes that the briefs in this case constitute a thorough presentation of the facts and legal issues and does not think oral argument would significantly assist the Court in deciding the issues before it.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF CONTENTS ............................................................................... iii

TABLE OF AUTHORITIES ............................................................................. v

STATEMENT OF JURISDICTION ................................................................... 1

STATEMENT OF THE ISSUES ....................................................................... 2

STATEMENT OF THE CASE .......................................................................... 4

   I.   Statutory and Regulatory Background ............................................. 4

   II.  Procedural History ....................................................................... 6

   III. Statement of Facts ........................................................................ 8

        A.   Prime Directs and Controls the Work of its Crew that Loads Vehicles into Containers for Shipment. .................................. 8

        B.   Prime Exposes the Loading Crew to Hazardous Work Conditions. ...... 11

        C.   OSHA Inspects Prime's Facility and Issues Citations to Prime Alleging Serious Violations of OSHA Standards. ................................... 13

        D.   The ALJ Affirms OSHA's Citation. ........................................ 14

STANDARD OF REVIEW ........................................................................... 18

SUMMARY OF THE ARGUMENT ................................................................ 20

ARGUMENT ........................................................................................... 21

   I.   The ALJ Correctly Determined that the Loading Crew Were Employees of Prime. ................................................................................. 23

        A.   Under the *Darden* Test, the Loading Crew Were Prime's Employees Because of Prime's Extensive Control Over Their Work. ................... 25

B. The Loading Crew Were Also Prime's Employees Under the "Economic Realities" Test Because They Were Economically Dependent on Prime. ..............................................................................................................33

II. Substantial Evidence Supports the ALJ's Determination that Prime Violated 29 C.F.R. § 1910.28(b)(3)(i) When it Failed to Protect Employees from the Fall Hazard Posed by an Uncovered Hole in Their Work Area. ...................38

III. Substantial Evidence Supports the ALJ's Determination that Prime Violated 29 C.F.R. § 1910.212(a)(3)(ii) Because it Failed to Ensure that a Chopsaw that Employees Regularly Used to Cut Wire Rope Was Properly Guarded. 45

CERTIFICATE OF COMPLIANCE .......................................................................53

CERTIFICATE OF SERVICE .............................................................................54

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Absolute Roofing & Const., Inc. v. Secretary of Labor*,
580 Fed.Appx. 357 (6th Cir. 2014) ............................................................. 30, 33

*Acies Grp., LLC*,
No. 08-1446, 2009 WL 3361402 (OSHRC ALJ Aug. 28, 2009) ........................30

*Acosta v. Hensel Phelps Constr. Co.*,
909 F.3d 723 (5th Cir. 2018) ..............................................................................23

*All Star Realty Co., Inc.*,
No. 12-1597, 2014 WL 533165 (OSHRC Feb. 3, 2014) ....................................25

*Angel Bros. Enters., Ltd. v. Walsh*,
18 F.4th 827 (5th Cir. 2021) ........................................................................ 21, 23

*Austin Indus. Specialty Servs., L.P. v. OSHRC*,
765 F.3d 434 (5th Cir. 2014) ....................................................................... 18, 19

*Badillo-Rubio v. RF Constr., LLC*,
No. CV 18-1092-JWD-RLB, 2022 WL 821421 (M.D. La. Mar. 17, 2022) ........37

*Berger Transfer & Storage v. Central States, Southeast and Southwest Areas
Pension Fund*,
85 F.3d 1374 (8th Cir. 1996) ..............................................................................19

*Berkebile Auto Serv., Inc.*,
No. 17-0923, 2019 WL 2094891 (OSHRC ALJ Apr. 1, 2019) ..........................33

*Brock v. City Oil Well Service Co.*,
795 F.2d 507 (5th Cir. 1986) ..............................................................................43

*Brock v. Mr. W Fireworks, Inc.*,
814 F.2d 1042 (5th Cir. 1987) ............................................................................37

*Brock v. Superior Care, Inc.*,
840 F.2d 1054 (2d Cir. 1988) ..............................................................27

*Brown & Root, Inc., Min. Indus. Heavy Const. Grp.*,
No. 79-2224, 1981 WL 40349 (5th Cir. Mar. 19, 1981)......................................45

*Bruecher Found. Servs., Inc. v. United States*,
No. A-06-CA-376-LY, 2009 WL 10669179 (W.D. Tex. Feb. 10, 2009)............31

*Bunge Corp. v. Sec'y of Labor*,
638 F.2d 831 (5th Cir. 1981) ...................................................... 22, 44

*Byrd Telcom, Inc. v. OSHRC*,
657 F. App'x 312 (5th Cir. 2016) ....................................................42

*C & W Facility Servs., Inc.*,
No. 17-2056, 2020 WL 1557600 (OSHRC ALJ Feb. 14, 2020) ........................27

*Calpine Corp. v. OSHRC*,
774 F. App'x 879 (5th Cir. 2019) ....................................................41

*Capform, Inc.*,
No. 91-1613, 1994 WL 530815 (OSHRC Sept. 29, 1994) ................................43

*Carlisle Equip. Co. v. Sec'y of Labor*,
24 F.3d 790 (6th Cir. 1994) ..............................................................44

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ......................................................................18

*Cromwell v. Driftwood Elec. Contractors, Inc.*,
348 F. App'x 57, 2009 WL 3254467 (5th Cir. 2009).................................. 34, 38

*Cuyahoga Valley Ry. Co. v. United Transp. Union*,
474 U.S. 3 (1985) ........................................................................4

*Daniel Crowe Roof Repair*,
No. 10-2090, 2011 WL 4824454 (OSHRC ALJ Aug. 25, 2011)................. 29, 30

*Don Davis*,
    No. 96-1378, 2001 WL 856241 (OSHRC July 30, 2001)....................................24

*Echo Powerline, L.L.C. v. OSHRC*,
    968 F.3d 471 (5th Cir. 2020) ...................................................................................44

*Edwards v. Guardian Life Insurance of Am.*,
    140 F.4th 729 (5th Cir. 2025) ................................................................ 19, 29, 31

*Envision Waste Servs., LLC*,
    No. 12-1600, 2018 WL 1735661 (OSHRC ALJ, Apr. 4, 2018) .........................50

*Equipment Holdings, Inc. v. OSHRC*,
    203 F.3d 828, 1999 WL 1240799 (5th Cir. 1999)...............................................25

*Excel Modular Scaffold & Leasing Co. v. OSHRC*,
    943 F.3d 748 (5th Cir. 2019) ...................................................................................18

*Fama Construction, LLC*,
    Nos. 17-1173 and 17-1180, 2019 WL 3210613 ...................................................28

*Faush v. Tuesday Morning, Inc.*,
    808 F.3d 208 (3d. Cir. 2015) ........................................................................ 26, 27

*Fm Home Improvement, Inc.*,
    No. 08-0452, 2009 WL 565082 (OSHRC ALJ Jan. 21, 2009) ...........................27

*Freightcar Am., Inc.*,
    No. 18-0970, 2021 WL 2311871 (OSHRC Mar. 3, 2021).......................... 24, 25

*Gen. Motors Corp., Rochester Prod. Div.*,
    No. 80–5439, 1985 WL 44845 (OSHRC Apr. 26, 1985)....................................44

*Hobbs v. Petroplex Pipe and Construction, Inc.*,
    946 F.3d 824 (5th Cir. 2020) ...................................................................... 19, 35, 37

*Hopkins v. Cornerstone Am.*,
    545 F. 3d 338 (5th Cir. 2008) ..................................................................................34

*Kaspar Electroplating Corp.*,
 No. 90-2866, 1993 WL 522462 (OSHRC, Dec. 16, 1993) .................................48

*Keleher v. Dominion Insulation, Inc.*,
 976 F.2d 726 (4th Cir. 1992) .........................................................................26

*Kelly Springfield Tire Co., Inc. v. Donovan*,
 729 F.2d 317 (5th Cir. 1984) .........................................................................50

*Kokosing Constr. Co.*,
 No. 92-2596, 1996 WL 749961 (OSHRC Dec. 20, 1996) .................................42

*Lake Erie Constr. Co., Inc.*,
 No. 02-0520, 2005 WL 2902315 (OSHRC Sept. 23, 2005) ..............................51

*Loomis Cabinet Co.*,
 No.88-2012, 1992 WL 117116 (OSHRC May 20, 1992) ...................................24

*Mar-Jac Poultry MS, L.L.C.*,
 No. 24-60026, 2025 WL 1904565 (5th Cir. 2025).............................................41

*Martin v. OSHRC*,
 499 U.S. 144 (1991) ........................................................................................4

*Mineral Indus. & Heavy Const. Grp. v. OSHRC*,
 639 F.2d 1289 (5th Cir. 1981) ................................................................. 47, 48

*N & N Contractors, Inc.*,
 No. 96-0606, 2000 WL 665599 (OSHRC May 18, 2000) .................................43

*N.L.R.B. v. E-Sys., Inc.*,
 642 F.2d 118 (5th Cir. 1981) .........................................................................49

*Nationwide Mut. Ins. Co. v. Darden*,
 503 U.S. 318 (1992) ................................................................................. passim

*Neman v. Greater Houston All-Pro Auto Interiors, LLC*,
 No. 4:11-CV-03082, 2012 WL 896438 (S.D. Tex. Mar. 14, 2012)....................35

*Nrg Sound & Commc'ns, LLC*,
  No. 10-2576, 2011 WL 5023844 (OSHRC ALJ Sep. 9, 2011) ...........................32

*Owens-Corning*,
  659 F.2d 1285 (5th Cir. 1981) ...............................................................44

*Parrish v. Premier Directional Drilling LP*,
  917 F.3d 369 (5th Cir. 2019) ....................................................... 14, 36

*Pennrock Constr. LLC*,
  No. 13-1662, 2015 WL 7756194 (OSHRC ALJ, Oct. 20, 2015)................. 26, 37

*Phoenix Roofing, Inc. v. Dole*,
  874 F.2d 1027 (5th Cir. 1989) .................................................... 49, 50

*S. Hens, Inc. v. OSHRC*,
  930 F.3d 667 (5th Cir. 2019) ................................................ 41, 45, 47

*Speedy Rooter/Capital Plumbing, Inc.*,
  No. 17-0274, 2019 WL 7373712 (OSHRC ALJ Nov. 19, 2019).......................31

*Stacey Manufacturing Co., Inc.*,
  No. 76–1656, 1982 WL 22594 (OSHRC Mar. 23, 1982) ...................................46

*Thibault v. Bellsouth Telecommunications, Inc.*,
  612 F.3d 843 (5th Cir. 2010) ....................................................... 24, 34

*Trinity Marine Nashville, Inc. v. OSHRC*,
  275 F.3d 423 (5th Cir. 2001) ...............................................................18

*United States v. Elashyi*,
  554 F.3d 480 (5th Cir. 2008) ....................................................... 39, 46

*United States v. Job*,
  387 F. App'x 445 (5th Cir. 2010) .........................................................28

*Usery v. Pilgrim Equip. Co., Inc.*,
  527 F.2d 1308 (5th Cir. 1976) .................................................... 35, 36

*Waldmann v. Fulp,*
 259 F. Supp. 3d 579 (S.D. Tex. 2016) .................................................29

*Warzala Constr.,*
 No. 19-0265, 2020 WL 7711146 (OSHRC ALJ, Nov. 16, 2020) .................29

*Whirlpool Corp. v. Marshall*,
 445 U.S. 1 (1980) ...................................................................................4

**STATUTES**:

29 U.S.C. § 3(6) ...........................................................................................23

29 U.S.C. § 654(a)(2) ....................................................................................4

29 U.S.C. § 659(a) .........................................................................................5

29 U.S.C. § 659(c) .......................................................................................1, 5

29 U.S.C. § 660(a) ............................................................................. 1, 5, 18, 43

29 U.S.C. § 661(j) .......................................................................................1, 5

29 U.S.C. §§ 203(e), (g) ...............................................................................24

29 U.S.C. §§ 651-678 ......................................................................................1

29 U.S.C. §§ 658-59, 666 ...............................................................................4

**RULES:**

Fed. R. App. P. 32(a)(7)(B)(i) ........................................................................52

Fed. R. App. P. 32(f) ....................................................................................52

**REGULATIONS:**

29 C.F.R. § 1910.132(a) ...............................................................................44

29 C.F.R. § 1910.21(b) ............................................................................. 17, 39

29 C.F.R. § 1910.212(a)(3)(ii) .......................................................... passim

29 C.F.R. § 1910.28(b)(3)(i) ............................................................ passim

29 C.F.R. § 1910.28(b)(3)(ii) ................................................................42

29 C.F.R. § 2200.90(f) ...........................................................................1

29 C.F.R. § 2200.91(a) ...........................................................................5

29 C.F.R. §§ 1910.21-30 ........................................................................5

29 C.F.R. §§ 1910.211-219 .....................................................................6

29 C.F.R § 1910.178(l)(1)(i) ..................................................................7

Walking-Working Surfaces and Personal Protective Equipment (Fall Protection Systems),
  for General Industry, 81 Fed. Reg. 82494 (Nov. 18, 2016) .............................6, 40

## OTHER AUTHORITIES:

Secretary's Order 7-2025, 90 Fed. Reg. 27878 (June 30, 2025) ..............................4

# STATEMENT OF JURISDICTION

Prime International Shipping LLC (Prime) seeks review of a final order of the Occupational Safety and Health Review Commission (Commission) related to a citation that the Occupational Safety and Health Administration (OSHA) issued to Prime under the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678 (OSH Act or Act). The Commission had jurisdiction over the proceeding under 29 U.S.C. § 659(c).

The decision of the administrative law judge (ALJ) affirming this citation became a final order of the Commission on February 28, 2025, after the Commission did not direct the decision for review. 29 U.S.C. § 661(j); 29 C.F.R. § 2200.90(f). Because Prime filed its April 8, 2025 petition for review within the sixty-day period prescribed by the OSH Act, this Court has jurisdiction under 29 U.S.C. § 660(a).

# STATEMENT OF THE ISSUES

1.      Whether the ALJ correctly determined that Prime's crew who loaded vehicles into shipping containers were Prime's employees rather than independent contractors where nearly all relevant factors in the test for an employment relationship indicated that they were employes, including that all work was done at Prime's facility; Prime provided all tools, equipment, and materials for the work; Prime "specifically" instructed the crew on how to load vehicles; Prime paid the crew weekly; and one crew member worked more than 40-hours-a-week and exclusively for Prime for a year-and-a-half.

2.      Whether substantial evidence supports the ALJ's determination that Prime violated 29 C.F.R. § 1910.28(b)(3)(i), which requires employers to protect employees from falling through holes in walking-working surfaces, where Prime employees commonly crossed over an uncovered hole without protection from falls while loading vehicles into shipping containers and Prime's owner admitted awareness of this practice.

3.      Whether substantial evidence supports the ALJ's determination that Prime violated 29 C.F.R. § 1910.212(a)(3)(ii), which requires employers to guard the point of operation of machines, where Prime employees regularly used a chopsaw with a bypassed guard, which exposed their fingers to a moving and

uncovered blade, Prime's owner was aware of that practice, and Prime did not have any rules prohibiting it.

**STATEMENT OF THE CASE**

## I.     Statutory and Regulatory Background

The fundamental objective of the OSH Act is to prevent occupational deaths and serious injuries. *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 11 (1980). The OSH Act imposes a duty on employers "to comply with occupational safety and health standards promulgated under [the OSH Act]." 29 U.S.C. § 654(a)(2).

The OSH Act divides rulemaking and enforcement powers from adjudicative powers and assigns these functions to two different entities: the Secretary and the Commission. *Martin v. OSHRC*, 499 U.S. 144, 147, 151 (1991). The Secretary[1] is charged with promulgating and enforcing workplace health and safety standards, and the Commission is responsible for carrying out the Act's adjudicatory functions. *Id.* at 147. OSHA prosecutes violations of the Act and OSHA standards by issuing citations requiring abatement of violations and assessing monetary penalties. 29 U.S.C. §§ 658-59, 666. The Commission is an independent agency whose role is to serve as a "neutral arbiter" of disputes between employers and OSHA that arise from those citations. *Cuyahoga Valley Ry. Co. v. United Transp. Union*, 474 U.S. 3, 7 (1985) (per curiam).

---

[1] The Secretary has delegated his responsibilities under the OSH Act to an Assistant Secretary who directs OSHA. Secretary's Order 7-2025, 90 Fed. Reg. 27878 (June 30, 2025). The terms "Secretary" and "OSHA" are used interchangeably in this brief.

4

An employer may contest a citation by filing a written notice of contest with OSHA within fifteen working days of receiving the citation. 29 U.S.C. § 659(a). Initially, an ALJ appointed by the Commission adjudicates the dispute. *Id*. §§ 659(c), 661(j). A party adversely affected by an ALJ's decision may petition for discretionary review of the decision by the Commission. *Id*. § 661(j); 29 C.F.R. § 2200.91(a). The Commission may direct review of an ALJ's decision, but if it does not do so within thirty days, the ALJ's decision becomes a final order of the Commission by operation of law. 29 U.S.C. §§ 659(c), 661(j). A party adversely affected or aggrieved by a final order of the Commission may seek review in the appropriate court of appeals. *Id*. § 660(a), (b).

In subpart D of part 1910 of the Code of Federal Regulations (C.F.R.), 29 C.F.R. §§ 1910.21-30, OSHA has promulgated safety standards that apply to general industry employers and regulate walking-working surfaces, *see id.* § 1910.21(a), including standards requiring employers to provide "[p]rotection from fall hazards." *Id.* § 1910.28(b). Section 1910.28(b)(3)(i) requires that employers protect "[e]ach employee . . . from falling through any hole . . . that is 4 feet (1.2 m) or more above a lower level" by implementing at least one of four controls, *id.* § 1910.28(b)(3)(i), such as installing a cover over the hole. *Id.* § 1910.28(b)(3)(i)(A). The purpose of the standard is to ensure that, "[w]here a hole is four feet or more above a lower level, . . . workers do not step or trip into the

hole or fall into it." Walking-Working Surfaces and Personal Protective Equipment (Fall Protection Systems) for General Industry, 81 Fed. Reg. 82494, 82597 (Nov. 18, 2016).

Additionally, OSHA has promulgated machine guarding standards in subpart O of part 1910, 29 C.F.R. §§ 1910.211-219. Section 1910.212(a)(3)(ii) requires employers to guard the "point of operation of machines whose operation exposes an employee to injury." *Id.* § 1910.212(a)(3)(ii); *see also id.* § 1910.212(a)(3)(i) (defining "point of operation" as "the area on a machine where work is actually performed upon the material being processed"). The standard further states that "the guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle." *Id.* § 1910.212(a)(3)(ii).

## II. Procedural History

OSHA initiated this enforcement action after a fatality occurred at the workplace of Prime, a freight forwarding company, in Houston, Texas, on July 12, 2022. Vol.3(38) (Decision and Order, Jan. 29, 2025) (Dec.) 3.[2] OSHA opened an

---

[2] Record documents are cited to the certified list that the Commission filed with the Court on May 14, 2025, following the format "Vol.[#](Item #)] at [page #]," except citations to the Commission hearing transcript, Vol.1, are abbreviated "Tr. [page #]" and citations to the ALJ's decision, Vol.3(38), are cited "Dec. [page#]." Citations to Prime's opening brief are abbreviated "Pet'r's Br. [page #]."

inspection of the workplace on July 13, 2022, Dec. 5, and ultimately issued Prime a citation alleging four violations of OSHA standards, two of which are at issue in this appeal:[3] a serious violation of 29 C.F.R. § 1910.28(b)(3)(i) for failing to protect employees from falling through a hole that is more than 4 feet above a lower level; and a serious violation of 29 C.F.R. § 1910.212(a)(3)(ii) for failing to use machine guarding to protect employees from a chopsaw's point of operation.

Prime contested the citation and a hearing was held before a Commission ALJ on July 16, 2024, in Houston, Texas. Dec. 3. On January 29, 2025, the ALJ issued a Decision and Order affirming the cited violations. *See* Dec. 31-32. Prime filed a petition for discretionary review, but the Commission did not direct the ALJ's decision for review, and it became a final order of the Commission on February 28, 2025. Vol.3(41). On April 10, 2025, Prime timely filed the instant petition for review with this Court.

---

[3] OSHA withdrew one violation prior to the hearing, Dec. 3, and Prime did not appeal the ALJ's determination that it violated 29 C.F.R § 1910.178(l)(1)(i) by failing to ensure that drivers of forklifts had proper training. *See* Dec. 20-24 (Citation 1, Item 3).

## III. Statement of Facts

### A. Prime Directs and Controls the Work of its Crew that Loads Vehicles into Containers for Shipment.

Prime is a freight forwarding company, owned and managed by Yaser Salem.[4] At its Houston facility, Prime loaded vehicles into shipping containers to send them to overseas buyers. Containers arrived at the facility on the backs of trucks, which were backed up to the loading dock at Prime's facility. Tr. 98:12-29. A three-man crew, comprised of Jose Vasquez, Ricardo Gonzalez, and Gerson Chavez-Ramirez, loaded the vehicles into the containers. Dec. 2; Tr. 64:12-66:6, 107:9-23, 110:24-111:23, 112:20-113:1, 133:23-135:3. Loading vehicles into shipping containers involved moving the vehicles with a forklift and suspending them inside the container with steel wire rope and a base made of lumber. Dec. 9; Tr. 79:24-80:2: 109:9-11. When the crew was not loading vehicles, they "would prepare materials for when they were needed" or clean up the work area. Dec. 13; Tr. 111:2-4, 107:21-23.

Salem hired Vazquez in 2021 and Vazquez considered Salem to be his boss. Dec. 4, 12; Tr. 121:9-10, 122:8-11. At the time of the fatality that prompted OSHA's inspection, Vazquez had been working exclusively for Salem for a year-

---

[4] During the hearing, witnesses referred to Yaser Salem in a variety of ways such as "Mr. Yaser," "Yaser," "Mr. Salem," and "Salem." For consistency, this brief refers to Prime's owner as "Salem."

and-a-half. Dec. 4; Tr. 107:12-20, 119:3-15. During this time period, Vazquez worked five-to-six days per week at Prime's warehouse and more than 40 hours a week. Dec. 12-13; Tr. 107:21-23, 119:3-15. The other members of the loading crew on the day of the fatality, Gonzalez and Chavez-Ramirez, had worked for Prime for three months and two weeks, respectively. Tr. 142:7-11.

Salem employed two other workers, Adam Hussein Abdirahman and "Navilla," both of whom worked in Prime's office. Dec. 4; Tr. 133:12-22, 135: 25-136:26. Like members of the loading crew, Abdirahman would operate forklifts in the facility. Dec. 4; Tr. 135:20-136:2.

Salem oversaw the daily work of the loading crew as they loaded vehicles for Prime. Vazquez could not miss work without notifying Salem. Dec. 5; Tr. 121:11-18. When Vazquez had a question related to his job duties, he would ask Salem. Dec. 5; Tr. 121:19-21. Vazquez would also go to Salem with questions about safety at the worksite. Dec. 5; Tr. 121:22-122:2.

Salem provided all the tools and materials that the crew needed to load the vehicles into containers, Dec. 11; Tr. 120:15-121:8, 122:3-19, 144:5-17, including a forklift, chopsaw, air gun, compressor, nail gun, tape measure, socket, and a camera to take a photo of the loaded vehicle. Dec. 11; Tr. 120:15-121:8, 122:3-19. Salem also provided the wire rope and lumber that the crew used to position the vehicles inside shipping containers. Dec. 11; Tr. 121:4-8, 99:23-100:2.

Additionally, Salem provided the crew with a dock plate, which could be used to bridge the gap that existed between the loading dock and the containers, although Salem only required the crew to use the dock plate for that purpose when the crew loaded expensive and low-profile vehicles into containers. Dec. 17-18; Tr. 61:20-62:3. Salem acknowledged that the crew members could not "bring every day all these tools and materials" to the workplace. Tr. 150:13-14.

Salem directly managed the car loading operation. Each day, Salem provided the crew with a list of the vehicles that needed to be loaded into containers. Dec. 3; Tr. 120:3-14, 145:2-14. According to Vazquez, when he needed to load a vehicle into a container, Prime would tell him "how they wanted them specifically." Dec. 10; Tr. 123:4-8. Likewise, when preparing a base to suspend a vehicle, Vazquez testified that Prime "would tell us specifically how to prepare the base." Dec. 5; Tr. 123:12-18. The loading crew would communicate any issues with the loading process to Salem such as when a customer's vehicles would not fit in a container. Dec. 4; Tr. 145:15-23. In such cases, Salem would work with the customer to resolve this issue. Dec. 4; Tr. 145:15-146:19.

Salem also personally controlled the hiring and payment of the loading crew. Salem testified that, before hiring a loading crew member, he verified that the candidate could do the job and then negotiated over the price he would pay them. Dec. 11-12; Tr. 142:24-143:3. Prime paid Vazquez weekly, and initially by check,

and later by Zelle, a digital payment application. Dec. 4; Tr. 119:16-23. Salem alleged that he deducted money from the crew's pay to cover "operating costs," such as the crew's use of tools and materials, Dec. 11-12; Tr. 150:5-151:12,154:8-14, but he could not offer specifics about the alleged deductions and claimed that they were handled by his accountant. Dec. 14; Tr. 151:10-12.

At the hearing, Prime introduced a 1099-NEC Form, which the IRS requires to report $600 or more in nonemployee compensation, for Vasquez dated in 2022. Dec. 12; Vol.(2)(Ex. R-26b). Vazquez did not understand the meaning of this form's reference to "non-employee compensation." Dec. 13; Tr. 124:20-25, 126:10-13. According to Salem, he determined that it was unnecessary to issue 1099-NEC forms to Chavez and Ricardo, the other loading crew members. Tr. 142:12-19.

### B. Prime Exposes the Loading Crew to Hazardous Work Conditions.

The edge of Prime's loading dock had large rubber bumpers to prevent truck drivers from damaging the dock when backing up. Tr. 116:1-6. When a truck parked at the dock to be loaded with vehicles, the bumpers created a hole, or gap, between the loading dock and the truck. Dec. 18-19; Tr. 138:7-15. The distance from the loading dock floor to the ground at the bottom of the hole was four feet and three inches. Dec. 6; Tr. 53:2-15; Vol.(2)(Exs. C-2c, C-2d).

The dock plate that Salem provided was available to the crew in the loading dock area, Tr. 114:15-22, 130:15-16, but the dock plate was only used to cover the hole when the crew was loading expensive, low-profile vehicles or when the container was higher than the loading dock. Dec. 17-18; Tr. 61:20-62:3, 113:24-114:3. Consequently, the hole was usually uncovered during the loading crew's work. Dec. 17-18; Tr. 113:13-18, 114:12-14; *see e.g.,* Vol.(2)(Ex. C-2a) (picture of hole between container and loading dock).

On July 12, 2022, the dock plate was not used to cover the hole while the crew loaded a vehicle into a shipping container. Dec. 17-18; Vol.(2)(Ex. C-7). During the day's work, all three loading crew members walked or drove a forklift over the uncovered hole between the dock and container. Dec. 17-18; Tr. 116:8-15.

Additionally, Prime provided the loading crew with a chopsaw to cut metal wire by the loading dock. Tr. 80:9-17. The chopsaw's blade was equipped with a guard, but Prime employees would tie up the guard with wire to bypass it, thereby exposing part of the blade, in order to cut the metal wire, which was used to suspend vehicles in shipping containers. Tr. 80:3-8, 82:13-83:1. Prime did not have any policies or procedures regarding the use or guarding of the chopsaw. Tr. 83:2-11.

**C.     OSHA Inspects Prime's Facility and Issues Citations to Prime Alleging Serious Violations of OSHA Standards.**

On July 12, 2022, a fatality occurred at Prime's warehouse, [5] Dec. 5; Tr. 49:17-50:5, and OSHA Compliance Safety and Health Officer (CSHO) Simon Cabello concluded onsite inspections on July 13-14, 2022. Dec. 5; Tr. 90:11-14. CSHO Cabello interviewed Salem, Vasquez, Gonzalez, and Abdirahman, and observed Prime's work practices and warehouse. Dec. 2, 5; Tr. 50:15-23. During CSHO Cabello's interview with Salem, Salem told CSHO Cabello that the loading crew and office workers at the facility were his employees. Tr. 89:10-18.

CSHO Cabello observed the hole between the loading dock and a container on the back of a truck where the employees had been working, Tr. 51:16-55, which was in the same position as it had been on the day of the fatality. Dec. 18; Tr. 54:22-25; Vol.(2)(Ex. R-5). CSHO Cabello took measurements and found that the hole was eight inches wide and the distance to the ground from the loading dock floor was four feet and three inches. Tr. 52:14-54:5; Vol.(2)(Exs. C-2a, C-2c, R-5). Salem told CSHO Cabello he was aware of this gap but did not use the dock plate because the wheels of the forklift are large enough to roll over the gap. Tr. 61:20-

---

[5] This fatality occurred when a suspended vehicle fell onto one of the members of the loading crew. The Secretary withdraw a citation item related to the fatality, Citation 1, Item 2, at trial. Dec. 2 n.1.

25. Salem said that the dock plate was sometimes used to cover the hole when loading expensive, low-profile vehicles. Tr. 62:1-3.

CSHO Cabello also saw the chopsaw with its guard tied up, Tr. 79:11-14; Vol.(2)(Exs. C-5a, C-5b), and measured "roughly two inches" of exposed blade to which workers would be exposed when they operated the saw. Dec. 26-27; Tr. 96:12-22. Salem told CSHO Cabello that the employees needed to tie the guard up to cut steel wire rope and forgot to put the guard back down. Dec. 26, 28; Tr. 82:23-83:1.

As a result of the inspection, OSHA issued the citations at issue. OSHA cited under 29 C.F.R. § 1910.28(b)(3)(i) for Prime's failure to protect employees from the fall hazard created by the hole between the loading dock and the container, and 29 C.F.R. § 1910.212(a)(3)(ii) for Prime's failure to ensure that the chopsaw's point of operation was properly guarded.

### D.    The ALJ Affirms OSHA's Citation.

Prime contested OSHA's citation and, on January 29, 2025, after a one-day hearing, the Commission ALJ issued a decision and order affirming all citation items at issue. First, the ALJ determined that the loading crew were Prime's employees. Dec. 8-16. The ALJ analyzed the loading crew's status under both the Supreme Court's test for identifying a "conventional master-servant relationship understood by common law agency doctrine," Dec. 8-14 (discussing and applying

the test articulated in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992)),

and the Fifth Circuit's "economic realities" test for identifying an "employee" for

purposes of the Fair Labor Standards Act (FLSA). Dec. 14-16 (discussing and

applying *Parrish v. Premier Directional Drilling LP*, 917 F.3d 369, 379 (5th Cir.

2019)). The ALJ determined that the loading crew members were "employees" of

Prime under both tests. *Id.* at 14, 16.

When applying the *Darden* test, under which several factors are considered

to assess the "hiring party's right to control the manner and means by which the

product is accomplished." *Darden*, 503 U.S. at 323, the ALJ found that the vast

majority of factors weighed towards finding Prime as the crew's employer. The

workers' employee status was evidenced, for example, by the facts that their tasks

did not require "an unusual level of skill," Prime told them "specifically" how to

do the work, Dec. 9-10, and Prime provided "all the tools, equipment, and

materials required." *Id.* at 13. Furthermore, although the duration of the

relationship varied based on the worker, Vazquez worked exclusively for Prime for

a year-and-a-half, during which he worked five-to-six days a week at Prime'

loading dock, for more than forty hours a week, and was required by Prime to give

notice when he was unable to work. *Id.* at 11-13. The ALJ ultimately determined

that Prime "control[ed] the what, when, where, and how of the loading crew's

work," *id.* at 13, and "exert[ed] a sufficient level of control over the conditions of the loading crew's employment to qualify [Prime] as their employer." *Id*. at 14.

Although Prime offered some evidence in an attempt to support its claim that the members of the loading crew were independent contractors, the ALJ deemed that evidence "small and, in some cases, equivocal." *Id*. at 13. The ALJ did not credit Salem's testimony that he made equipment-and-material-based deductions from the loading crew's pay based on alleged negotiations with the workers, *see id*. at 11-12, because he "gave virtually no specifics." *Id*. at 14. And, even assuming these deductions occurred, the ALJ found that they would only be "illustrative of [Prime's] control rather than a conscious investment by the laborers." *Id*. at 16. Also insufficient to outweigh the evidence of an employer/employee relationship were the facts that Prime switched from weekly checks to weekly payment through Zelle, which the ALJ viewed as "equivocal or slightly [indicative of] an independent contractor relationship," *id*. at 13, and Prime's issuance of a Form 1099-NEC to Vazquez, "who did not understand its significance." *Id*.

The ALJ next determined that the loading crew would also be considered employees of Prime under the economic realities test used by this Court in FLSA cases. Dec. 14-16. Prime directed the loading crew's work and their "discretion was circumscribed by the specifications imposed by [Prime]." *Id*. at 15. The

loading crew did not invest in the business and brought "little more than their labor." *Id*. The ALJ was unconvinced that Salem's alleged deductions from the crew's pay for materials and tools were occurring, however, even if they were, any deductions "illustrat[ed] [Prime's] control rather than a conscious investment by the laborers." *Id*. at 16. Accordingly, under both tests, the ALJ held that the loading crew were Prime's employees.

The ALJ went on to affirm both violations at issue in this appeal. With respect to the violation of 29 C.F.R. § 1910.28(b)(3)(i), the ALJ determined that the eight-inch gap between the loading dock and the container qualified as a "hole" under OSHA standards, *id*. at 17; *see* 29 C.F.R. § 1910.21(b) (defining "hole," among other terms), and that Prime violated the cited standard when the loading crew crossed the uncovered gap during their work without placing a dock plate over the hole. Dec. at 17-18. A video of the loading dock on the day of the fatality showed employees walking over the gap, thereby establishing that employees were exposed to the hazard. *Id* at 18. The ALJ further determined that Prime had knowledge of the hazard because "[t]he gap between the floor and the shipping container was an open, obvious, and consistent condition," and because Salem's statements acknowledged the hole and the availability of the dock plate to cover it. *Id*. at 19.

With respect to the cited violation of 29 C.F.R. § 1910.212(a)(3)(ii), the ALJ determined that the standard applied to the chopsaw, Dec. 24, and was violated because, as captured in CSHO Cabello's photos taken during the inspection, the chopsaw's blade guard was tied back, exposing part of the blade. *Id*. at 25; Vol.2(Exs. C-5a, C-5b). The ALJ determined that at least one of Prime's employees was exposed to the unguarded blade because the crew used the chopsaw to chop wire rope, and Salem told CSHO Cabello that tying up the guard was necessary to complete that task. Dec. 25-26. The ALJ noted that Salem's statements demonstrated that Prime was aware of this hazardous condition and discredited Salem's testimony disavowing any knowledge of the chopsaw being used with its guard tied up. *Id*. at 26. The ALJ further found that Prime had no work rules to ensure safe operation of the chopsaw. *Id*. at 27-28. Accordingly, the ALJ affirmed both citation items and assessed a combined penalty of $6,837.

## STANDARD OF REVIEW

The Court is bound by the Commission's findings of fact so long as they are supported by "substantial evidence," 29 U.S.C. § 660(a), and must uphold substantially supported findings even if the Court could justify reaching a different conclusion *de novo*. *Austin Indus. Specialty Servs., L.P. v. OSHRC*, 765 F.3d 434, 438 (5th Cir. 2014) (quoting *Trinity Marine Nashville, Inc. v. OSHRC*, 275 F.3d 423, 426-27 (5th Cir. 2001)). "Substantial evidence is 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966)). The substantial evidence standard applies with equal force where, as here, an ALJ decision is the final order of the Commission. *See Excel Modular Scaffold & Leasing Co. v. OSHRC*, 943 F.3d 748, 753 (5th Cir. 2019).

The Commission's legal conclusions must be upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Austin Indus.,* 765 F.3d at 438-39. Whether an individual is an employee or an independent contractor "is a question of law that this court reviews *de novo*," *Edwards v. Guardian Life Insurance of Am.*, 140 F.4th 729, 732 (5th Cir. 2025) (citation omitted), but the Commission's factual findings underlying that analysis must be accepted unless they are unsupported by substantial evidence. *Cf. Hobbs v. Petroplex Pipe and Construction, Inc.*, 946 F.3d 824 (5th Cir. 2020) (district court's factual findings regarding employment status reviewed under deferential standard, while "ultimate determination of employee status is a finding of law subject to *de novo* consideration by this court"); *see also Berger Transfer & Storage v. Central States, Southeast and Southwest Areas Pension Fund*, 85 F.3d 1374, 1377-38 (8th Cir. 1996) ("findings underlying each of the common-law factors [in a *Darden* analysis] are factual findings, while the

ultimate conclusion as to whether an individual is an employee or an independent contractor is a question of law").

## SUMMARY OF THE ARGUMENT

The ALJ correctly determined that Prime's loading crew were Prime employees. Under the *Darden* test, Prime control[ed] "the what, when, where, and how of the loading crew's work" and was therefore clearly the loading crew's employer. Dec. 13. Prime hired the crew for indefinite and, in one instance, long-lasting employment; oversaw and "specifically" controlled how the crew conducted its work; controlled their hours; provided all necessary tools and materials; and paid the crew weekly for their labor. Furthermore, although *Darden* is the appropriate test for assessing the loading crew's employment status, the ALJ correctly concluded that the crew would also be employees of Prime under the "economic realities" test. The loading crew was economically dependent on Prime because they exercised negligible discretion during their work, did not invest in Prime, and had no opportunity for profit or loss. Regardless of the test, the result is the same—the loading crew were Prime's employees.

Substantial evidence supports the ALJ's findings that Prime violated 29 C.F.R. § 1910.28(b)(3)(i), as Prime failed to protect employees from the uncovered hole between the loading dock and the container. Testimony and video evidence established that the loading crew repeatedly crossed the uncovered hole during

their work, and were thereby actually exposed to the hazardous condition, on July 12, 2022. Furthermore, the owner of Prime's awareness of the hole and that a dock plate cover was only used in limited circumstances established Prime's knowledge of the hazardous condition. Even if Prime did not have actual knowledge, Prime could have known with the exercise of reasonable diligence that employees crossed over the "open, obvious, and consistent" hole between the loading dock and the containers without any protection from the fall hazard.

Likewise, substantial evidence supports the ALJ's determination that Prime violated 29 C.F.R. § 1910.212(a)(3)(ii), as Prime's chopsaw was not properly guarded and Prime employees had reasonably predictable exposure to the chopsaw's partially exposed blade. Prime employees regularly used the chopsaw with the guard tied up when cutting wire rope which left part of the blade exposed. Salem admitted his awareness of this practice to the CSHO during the inspection. In addition to Salem's actual knowledge, Prime had constructive knowledge of the violative condition because Prime made no effort to ensure that the loading crew used the chopsaw with the guard properly installed. Accordingly, the ALJ rightly affirmed both citation items, and Prime's petition for review should be dismissed.

## ARGUMENT

To establish a violation of an OSHA standard, the Secretary must prove "(1) that the cited standard applies; (2) noncompliance with the cited standard; (3)

access or exposure to the violative conditions; and (4) that the employer had actual or constructive knowledge of the conditions through the exercise of reasonable due diligence." *Angel Bros. Enters., Ltd. v. Walsh*, 18 F.4th 827, 830 (5th Cir. 2021). On appeal, Prime challenges the ALJ's determination that the Secretary established the second,[6] third, and fourth elements for both citation items. With respect to the third element (access or exposure to the violative conditions), Prime contests the ALJ's determination that the members of its loading crew were employees, rather than independent contractors. *See* Pet'r's Br. 13-14. Additionally, Prime contests the ALJ's findings that the Secretary offered sufficient evidence to establish that Prime violated the cited standards, that loading crew members were exposed to the hazardous conditions, and that Prime had knowledge of the hazardous conditions.

As discussed below, Prime directed and controlled the loading crew's work, and the ALJ correctly determined that the loading crew were Prime's employees

---

[6] Prime's opening brief identifies the third and fourth elements as the elements in contest on appeal, *see* Pet'r's Br. 3 (Issue #2), but also repeatedly argues that the Secretary did not prove that the cited hazards existed. *See, e.g., id.* at 3 (claiming "no evidence established either hazard on the date of the Citation"), at 8 (alleging "no evidence established whether the chopsaw was unguarded on the date of the inspection"). Because the Secretary's proof that Prime did not comply with the terms of §§ 1910.28(b)(3)(i) and 1910.212(a)(3)(ii) establishes that the hazards existed, the Secretary construes Prime's arguments regarding the existence of the hazards as contesting whether it complied with the cited standards. *See Bunge Corp. v. Sec'y of Labor*, 638 F.2d 831, 835 (5th Cir. 1981) ("When the violative element is only a condition, hazard is presumed, and the Secretary need only show the existence of the violative condition and worker exposure to the condition.").

for purposes of the OSH Act. Additionally, substantial evidence supports the ALJ's findings that Prime violated the terms of each standard, Prime employees had access and/or were exposed to the resulting hazardous conditions (*i.e.*, the uncovered hole and the unguarded chopsaw), and Prime had both actual and constructive knowledge that the violative conditions existed. The Court should therefore dismiss the petition for review.

## I. The ALJ Correctly Determined that the Loading Crew Were Employees of Prime.

As discussed *supra,* the Secretary generally establishes the third element of her *prima facie* case by showing that one or more employees had access or were exposed to the condition that violated the standard.[7] *Angel Bros.,* 18 F.4th at 830. The Act defines an "employee" as "an employee of an employer who is employed in a business of his employer which affects commerce." 29 U.S.C. § 3(6); *see also id.* at § 3(5) (defining "employer," in relevant part, as "a person engaged in a business affecting commerce who has employees"). Here, Prime argues that the members of its loading crew were not "employees" within the meaning of the Act, but the ALJ correctly rejected that argument below. *See* Dec. 5-14.

---

[7] Although not at issue in this case, employers may, in certain circumstances, be liable for violating OSHA standards even where only employees of other employers were exposed to the hazard. *See Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723 (5th Cir. 2018); *see also* Dec. 31 n.15 (noting that characterization the loading crew as independent contractors "would not necessarily absolve Prime's of liability under the Act").

Given the circular nature of the statutory definition of "employee," the Commission evaluates whether an individual was an "employee" of an entity using the test announced by the Supreme Court in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992); *see, e.g., Don Davis*, No. 96-1378, 2001 WL 856241, *3 (OSHRC July 30, 2001) (applying *Darden*). This is consistent with the Supreme Court's finding that, where the term is not helpfully defined in the statute, "Congress intended the term 'employee' to describe the conventional master-servant relationship as understood by common-law agency doctrine." *Freightcar Am., Inc.*, No. 18-0970, 2021 WL 2311871, *2 (OSHRC Mar. 3, 2021) (cleaned up and citations omitted). Here, the ALJ applied the *Darden* test and determined that Prime's loading crew were "employees" of Prime. Dec. 5-14.

Additionally, because this Court has applied an "economic realities" test to determine whether a worker is an employee or independent contractor under the FLSA, *see Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 845 (5th Cir. 2010), the ALJ also applied that test and determined that Prime's loading crew were economically dependent on Prime and therefore its employees. Dec. 6-11; *Loomis Cabinet Co.*, No.88-2012, 1992 WL 117116, at *3 (OSHRC May 20, 1992) ("many of the factors in the . . . economic realities test appear in the *Darden* test as well"), *aff'd*, 20 F.3d 938 (9th Cir. 1994).

Although the *Darden* test, not the economic realities test, is the correct framework for assessing the loading crew's employment status,[8] the ALJ correctly determined that Prime was the employer of the loading crew under either test. *See Equipment Holdings, Inc. v. OSHRC*, 203 F.3d 828, 1999 WL 1240799, at *1 (5th Cir. 1999) (unpublished) (affirming ALJ's determination that, based on the *Darden* test, cited entity was the "employer" of an individual under the OSH Act).

### A. Under the *Darden* Test, the Loading Crew Were Prime's Employees Because of Prime's Extensive Control Over Their Work.

The *Darden* test's overall "focus [is] on 'the hiring party's right to control the manner and means by which the product is accomplished.'" *Freightcar Am.*, 2021 WL 2311871 at *3 (citing *All Star Realty Co., Inc.*, No. 12-1597, 2014 WL 533165, at *2 (OSHRC Feb. 3, 2014)). The factors in a *Darden* analysis are:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in

---

[8] The Supreme Court explained in *Darden* that, in addition to a circular definition of "employee," the FLSA "defines the verb 'employ' expansively to mean 'suffer or permit to work,'" 503 U.S. at 324 (citing 29 U.S.C. §§ 203(e), (g)), which "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Id.* The absence of such a definition of "employ" in the OSH Act "precludes reliance" on the FLSA-based economic realities test for determining if an individual was an "employee" for purposes of the OSH Act. *Id.*

business; the provision of employee benefits; and the tax treatment of the hired party.

503 U.S. at 323-24. How the contracting parties view their relationship is also relevant in a *Darden* analysis. *See, e.g., Keleher v. Dominion Insulation, Inc.*, 976 F.2d 726 (4th Cir. 1992) (discussing how parties characterized their putative employment relationship).

Here, the ALJ correctly weighed the factors and found that they overwhelmingly established that the loading crew were employees. To start, with respect to the *Darden's* overall focus on control, Prime directed the loading crew as they loaded vehicles. Prime told the crew which vehicles were going to be loaded and when and also told the crew "specifically" how to load vehicles into containers. Dec. 10-11; Tr. 123:4-18, 120:3-14, 145:2-14; *see, e.g., Faush v. Tuesday Morning, Inc.* 808 F.3d 208, 211, 216, 218 (3d. Cir. 2015) (employment relationship supported by facts that hiring entity "assigned [the hired party] tasks to perform on a daily basis" and "instructed [the hired party] on the details of the work"). Prime's control strictly limited the loading crew's discretion at the work site. Dec. 12-13.

The skill level required to complete the loading crew's tasks also supports their employee status. *See* Dec. 9-11. The loading crew's duties were of a similar skill level to "general construction experience" and did not require "specialized skill." *Pennrock Constr. LLC*, No. 13-1662, 2015 WL 7756194, at *13 (OSHRC

ALJ, Oct. 20, 2015) (holding general construction work under a foreman's guidance weighed in favor of employer status). The loading crew was also responsible for cleaning Prime's facility, which further supports that Prime employed the crew. Tr. 107:21-23; *C & W Facility Servs., Inc.*, No. 17-2056, 2020 WL 1557600, at *29 (OSHRC ALJ Feb. 14, 2020) (describing cleaning work as "essentially manual labor and does not require specialized skill"), *overruled on other grounds*, 22 F.4th 1284 (11th Cir. 2022).

Moreover, even to the extent that the loading crew's work required skill, the loading crew did not use their "skills in any independent way" because of Prime's close supervision of their work. *Fm Home Improvement, Inc.*, No. 08-0452, 2009 WL 565082, at *7 (OSHRC ALJ Jan. 21, 2009) (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988)); *see* Dec. 10-11 (finding that, whether Prime "showed [the loading crew] how to prepare the bases for loading cars at the beginning of their employment" or "show[ed] the crew how to load the cars and prepare the base for each individual container," either scenario indicates that "the work itself does not require a level of specialization and sophistication associated with independent contractor status" and Prime "maintain[ed] significant control over the process"). Lastly, regardless of the level of skill, the loading crew performed some of the same work, such as operating forklifts, that was performed by Abdirahman, who Prime admitted was its employee. Tr. 135:20-136:2; *see, e.g.,*

*Tuesday Morning*, 808 F.3d at 217 (employment relationship supported by the fact that "the tasks assigned to the [hired party] ... were no different than those assigned to" individuals that the hired party admitted were its employees). The ALJ thus correctly determined that the skill required to complete the loading crew's work weighed towards finding Prime as the employer of the loading crew. Dec. 9-11.

As for the method of payment, the loading dock's crew were paid weekly, first by check and later by Zelle, which also weighs in favor of finding that Prime was the employer of the loading crew. *See United States v. Job*, 387 F. App'x 445, 455 (5th Cir. 2010) (noting payment "by the hour, week, or month" indicates employee status under *Darden*); *Fama Construction, LLC*, Nos. 17-1173 and 17-1180, 2019 WL 3210613, at* 13 (OSHRC ALJ Jun. 5, 2019) (finding issuance of weekly paychecks indicated an employment relationship).

With respect to this factor, the ALJ correctly dismissed as unpersuasive Salem's testimony that he deducted "operating expenses" from the loading crew's pay, which allegedly were the result of negotiations between him and the members of the loading crew. Dec. 11-12; Tr. 143:17-144:3. Salem could not provide specifics about the alleged deductions, repeatedly stated that he would need to consult his accountant, Tr. 150:25-151:3, 151:11-12, 151:25-152:3, and could not produce any documents proving that the deductions occurred. Tr. 151:25-152:8. Moreover, as the ALJ recognized, Dec.12, even if the deductions occurred, Salem

could not establish that they resulted from negotiations with independent contractors; indeed, Vazquez recounted his conversation with Salem at the time of his hiring as a cursory discussion. Dec. 12; Tr. 118:12-119:2. Accordingly, the ALJ properly weighed the method of payment in favor of an employment relationship.

The provision of materials and equipment, as well as the work's location, is further evidence that Prime was the loading crew's employer. The fact that Prime "provide[d] all the tools, equipment, and materials required to perform the job of loading the cars," Dec. 11 (citing Tr. 121), indicates an employment relationship. *See, e.g., Waldmann v. Fulp,* 259 F. Supp. 3d 579, 623-624 (S.D. Tex. 2016) (determining fact that "all of the equipment [] used was supplied by [putative employer]" weighed in favor of employee status) (internal quotations omitted); *Daniel Crowe Roof Repair,* No. 10-2090, 2011 WL 4824454, at *11 (OSHRC ALJ Aug. 25, 2011). Likewise, the location of the work, all of which occurred at Prime's warehouse, weighs in favor of an employment relationship because the crew "regularly report[ed] to a site owned or controlled" by Prime. *Warzala Constr.,* No. 19-0265, 2020 WL 7711146, at *9 (OSHRC ALJ, Nov. 16, 2020); *Edwards*, 140 F.4th at 732 (putative employer "owned the [] building and equipment, so she controlled where the technicians worked and their means of doing so").

The same conclusion is supported by the duration of Prime's working relationship with Vazquez, Prime's ability to assign additional projects to the loading crew, and Prime's discretion over when and how long the loading crew worked. Vazquez, for example, worked for Prime exclusively for a year-and-a-half, during which time he worked five-to-six days each week, accumulating forty hours or more each week.[9] Dec. 12-13; Tr. 119:3-15. This strongly supports the finding of employer status. *See, e.g., Absolute Roofing & Const., Inc. v. Secretary of Labor,* 580 Fed.Appx. 357, 362 (6th Cir. 2014) (duration of relationship supported employee status where individual worked for the hiring party "for about four months at the time of [OSHA's inspection]" and "continued to work for [the hiring party] for almost one year after the inspection"); *Acies Grp., LLC,* No. 08-1446, 2009 WL 3361402, at *10 (OSHRC ALJ Aug. 28, 2009) (holding "about two year" relationship to weigh in favor of employment status). Whenever Vazquez was not loading vehicles, he was "clean[ing] up" or preparing materials to load vehicles, Tr. 107:21-23, "which suggests that he was at [Prime's] disposal." *Daniel Crowe*, 2011 WL 4824454, at *12; *see also, e.g., Absolute*, 580 Fed. Appx. at 362 (employee status supported by hiring entity's right to assign the worker additional duties). Vazquez had no discretion when to work because he was

---

[9] At the time of the fatality, Gonzalez was there for around three months and Chavez for two weeks. Tr. 142:7-11.

required to notify Prime in advance when he needed to miss work. Tr. 121:11-15; *see, e.g., Absolute*, 580 Fed. Appx. at 362 (employee status evidenced by hiring entity's control over worker's hours). Accordingly, the ALJ correctly identified these three factors as further supporting an employer-employee relationship. Dec. 12-13.

The loading crew's lack of role in hiring and paying assistants, their responsibility for work that was part of Prime's regular business, and the subjective understanding of the parties regarding their employment status adds to the litany of evidence that Prime was the employer of the loading crew. Salem personally controlled the hiring of loading dock workers, Tr. 153:15-154:7 (Salem testifying that he personally vetted potential workers and then hired them based on his assessment of their suitability and Prime's business needs), and the loading crew was not part of this process. *See, e.g., Bruecher Found. Servs., Inc. v. United States*, No. A-06-CA-376-LY, 2009 WL 10669179, at *7 (W.D. Tex. Feb. 10, 2009), *aff'd*, 383 F. App'x 381 (5th Cir. 2010) (finding this factor weighed for employee status where "workers occasionally brought new crew members with them to work and suggested that [employer] hire them, [but employer] did the hiring and paid the worker"); *Speedy Rooter/Capital Plumbing, Inc.*, No. 17-0274, 2019 WL 7373712, at *8 (OSHRC ALJ Nov. 19, 2019) (holding business was an employer where it hired two workers to work alongside one another and neither

hired an assistant). The work of the loading crew was integral to Prime's regular business as a shipping company. *Edwards*, 140 F.4th at 732 (the fact that putative employer "was in business and the technicians' work constituted its normal business" weighed in favor of employee status under *Darden*). Additionally, Vazquez viewed Salem as his "boss," Dec. 4; Tr. 121:9-10, and CSHO Cabello testified that during his investigation Salem told him that all workers at Prime were his employees. Tr. 89:10-18.

The remaining *Darden* factors are absent or equivocal about employment status. There was no testimony about any benefits provided by Prime to the loading crew, which tells little about the nature of their employment relationship. Dec. 13; s*ee Nrg Sound & Commc'ns, LLC*, No. 10-2576, 2011 WL 5023844, at *6 (OSHRC ALJ Sep. 9, 2011) ("While the provision of employee benefits and withholding of taxes from a paycheck is usually indicative of an employment relationship, the converse is not as telling."). As for tax treatment, Prime produced a 1099-Nonemployee Compensation (NEC) Form for Vazquez from 2022, but the ALJ rightly afforded that evidence little probative weight. Dec. 13. Prime did not issue any other 1099-NEC forms. Tr. 142:7-19, 126:10-16, 141:21-142:3. Vazquez did not grasp the significance of the 1099-NEC and did not know what the form's reference to "non-employee compensation" meant. Dec. 4; Tr. 124:17-25. The ALJ aptly judged the sole 1099-NEC form as only suggesting that an independent

contractor relationship existed on a "surface level." Dec. 13. And, even if the issuance of a single form did point toward the loading crew being independent contractors, tax treatment by itself is not determinative of the *Darden* inquiry. *See Berkebile Auto Serv., Inc.*, No. 17-0923, 2019 WL 2094891, *11 (OSHRC ALJ Apr. 1, 2019) ("Here, the taxes and benefits are like those of an independent contractor relationship. Even so, tax reporting status is not the controlling factor in a *Darden* analysis."); *Absolute*, 580 Fed. Appx. at 361-63 (determining that worker was an employee of the hiring entity even though the employee benefits and tax treatment factors weighed in favor of an independent contractor relationship).

In conclusion, the overwhelming weight of the *Darden* factors prove conclusively that Prime employed the loading crew. The ALJ thus correctly determined that the loading crew were Prime's "employees" for purposes of the OSH Act, including when determining if any Prime employees were exposed to the conditions that violated 29 C.F.R. §§ 1910.28(b)(3)(i) and 1910.212(a)(3)(ii).

**B.   The Loading Crew Were Also Prime's Employees Under the "Economic Realities" Test Because They Were Economically Dependent on Prime.**

As explained *supra*, the *Darden* test is the appropriate framework for assessing whether an individual was an "employee" for purposes of the OSH Act, and therefore, it was unnecessary for the ALJ to also determine that the loading crew were "employees" of Prime under the economic realities test. Dec. 14-16.

However, even if the economic realities test were relevant, the ALJ's conclusion was correct.

The "economic realities" test focuses on the putative employees' economic dependence on the employer. The "relevant question is whether the alleged employee so economically depends upon the business to which he renders his services such that the individual, as a matter of economic reality, is not in business for himself." *Thibault,* 612 F.3d at 845. The factors relevant to this inquiry are:

(1) The degree of control exercised by the alleged employer;
(2) The extent of the relative investments of the worker and the alleged employer;
(3) The degree to which the worker's opportunity for profit or loss is determined by the alleged employer;
(4) The skill and initiative required in performing the job; and
(5) The permanency of the relationship.

*Hopkins v. Cornerstone Am.*, 545 F. 3d 338, 343 (5th Cir. 2008). No single factor is determinative, and the court weighs the totality of the circumstances. *Id*.

As outlined above, Prime exercised extensive control over the loading crew. When a worker is assigned daily tasks with limited discretion, the factor indicates employee status, *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 61, 2009 WL 3254467, at **3 (5th Cir. 2009) (unpublished), and such was the case with Prime's loading crew. After determining which vehicles were going to be loaded and when, Prime told the crew "specifically" how to build a base for these vehicles and how to load them. Dec. 4-5, 15; Tr. 120:3-14, 145:2-14, 123:4-18.

The loading crew would direct their questions about safety and how to complete their tasks to Salem. Dec. 5; Tr. 121:19-122:2. Prime gave the loading crew negligible discretion in determining how to complete their tasks; for example, Prime did not tell the loading crew exactly how much lumber should be used. Tr. 123:9-12. But, as noted by the ALJ, Prime's specifications limited the loading crew's exercise of independent judgment for vehicle loading and base construction. Dec. 10; *see Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1312 (5th Cir. 1976) (finding laundry operators "[had] no viable economic status that can be traded to other [] companies and the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence").

Additionally, the loading crew did not invest anything in Prime and any opportunity for profit or loss was entirely controlled by Prime. Prime provided all tools and materials as well as the facility where the loading crew worked. Vazquez's schedule, which was five-to-six days per week for forty hours or more, severely limited his opportunity for profit or loss and shows his economic dependence on Prime. Dec. 15-16; *see Petroplex Pipe,* 946 F.3d at 833 (upholding determination of employer status because workers had "severely limited" opportunity for profit or loss when they "regularly worked more than forty hours a week" for the same business). The fact that Prime offered a Form 1099-NEC for Vazquez does not outweigh that Vazquez did not invest in Prime and had no

opportunity for profit and loss from its business. Vol.3(Ex. R-26b); *see Neman v. Greater Houston All-Pro Auto Interiors, LLC*, No. 4:11-CV-03082, 2012 WL 896438, at *3 (S.D. Tex. Mar. 14, 2012) ("[A] 1099 form is also not dispositive"); *see also Parrish*, 917 F.3d at 388.

Prime claims that the deductions that it alleged took from the loading crew's pay for "operating expenses" gave the loading crew the opportunity to "obtain additional funds if they furnished their own tools and equipment," Pet'r's Br. 13, but, as explained *supra*, Salem was unable to provide specifics about the alleged deductions, Tr. 150:25-151:18, and did not produce any documents corroborating their existence. Tr. 151:25-152:8. The ALJ was thus reasonably "unconvinced the material and equipment deductions claimed by Salem were actually occurring." Dec. 16.

And, even assuming that deductions did occur, they did not offer the loading crew an opportunity to "invest" in Prime and "profit" from their work. *See e.g. Usery*, 527 F.2d at 1313 (no opportunity for profit and loss where "major determinants of the amount of profit which an operator could make, however, were directly controlled by [employer]," and finding that a business deducting the cost of lost equipment from its workers' pay is not loss but an "added burden" on employees). Moreover, Salem admitted that, in practice, the loading crew "cannot bring every day all the [necessary] tools and materials" to the workplace. Tr.

36

150:13-14. Because this lack of investment or opportunity for profit and loss, the loading crew were effectively "wage earners toiling for a living, [not] independent entrepreneurs seeking a return on [a] risky capital investment." *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1051 (5th Cir. 1987). This factor weighs heavily towards employee status.

Additionally, as explained above, the skill of the work in which the loading crew were engaged supports that they were employees of Prime, as it was comparable to "general construction" work. *Pennrock Constr. LLC*, 2015 WL 7756194, at *13; *see also Badillo-Rubio v. RF Constr., LLC*, No. CV 18-1092-JWD-RLB, 2022 WL 821421, at *12 (M.D. La. Mar. 17, 2022) (unpublished) (holding skill was evidence of employee relationship where worker used specialized tools and heavy machinery in "[r]outine work" on construction sites). Moreover, to the extent that the crew's work involved specialized skill, the Prime's control over how the crew worked limited the crew's discretion and initiative and further shows an employment relationship. Dec. 10-11 (explaining that Prime's provision of detailed instructions to the loading crew on how to performed certain work evinced both that "the work itself d[id] not require a level of specialization and sophistication associated with independent contractor status" and that Prime "limit[ed] the ability of any crew, specialized or not" to perform the work); *see also Petroplex Pipe,* 946 F.3d at 834 (upholding determination that skilled pipe

welders were employees because they did not demonstrate initiative at the workplace). Accordingly, the loading crew were Prime's employees whether or not their work required specialized skill.

Finally, Vazquez's relationship with Prime weighs towards an employment relationship because Vazquez worked exclusively for Prime for a year and a half. *See Cromwell,* 348 Fed.Appx. at 61 (finding the permanency factor meant workers were employees when their employment "steady and reliable . . . over a substantial period of time—approximately eleven months exclusively for their purported employers").

In conclusion, all five factors of the economic realities test support that the loading crew were Prime's employees because they were economically dependent on Prime. The ALJ correctly dismissed Prime's arguments to the contrary as "merely a thin veneer designed to give the appearance of a relationship that does not exist in economic reality," Dec. 2, and this Court should do the same.

## II. Substantial Evidence Supports the ALJ's Determination that Prime Violated 29 C.F.R. § 1910.28(b)(3)(i) When it Failed to Protect Employees from the Fall Hazard Posed by an Uncovered Hole in Their Work Area.

Substantial evidence supports the ALJ's determination that Prime violated 29 C.F.R. § 1910.28(b)(3)(i), including the ALJ's findings that Prime failed to comply with the terms of the standard, employees had access or were exposed to the resulting hazard, and Prime knew that the hazardous condition existed at its

worksite.[10] *See* Dec. 16-20. To start, substantial evidence supports the ALJ's finding that Prime violated the terms of § 1910.28(b)(3)(i). The standard requires employers to ensure that their employees are protected from falling through any hole that is four feet or more above a lower level. 29 C.F.R. § 1910.28(b)(3)(i). For purposes of this standard, a "hole" is defined as a "gap or open space in a floor, roof, horizontal walking-working surface, or similar surface that is at least 2 inches (5 cm) in its least dimension." 29 C.F.R. § 1910.21(b).

Here, the rubber bumpers at the end of Prime's loading dock created an eight-inch gap between the dock and a container, and the distance from the surface of the loading dock to the ground at the bottom of the hole was four feet and three inches. Tr. 52:14-54:5; Vol.(2)(Exs. C-2a, C-2d). CSHO Cabello measured the hole during his inspection, which reflected the size of the hole before the fatal incident occurred on July 12, 2022. Dec. 18; Tr. 54:22-25. That eight-inch gap qualified as a "hole" under 29 C.F.R. § 1910.21(b), and because the surface of the loading dock, a walking-working surface, was more than four feet from the ground at the bottom of the hole, Prime was obliged by § 1910.28(b)(3)(i) to cover it or

---

[10] In its opening brief, Prime does not challenge the ALJ's determination that standard applied, Dec. 25, therefore any such argument is waived. *See, e.g., United States v. Elashyi*, 554 F.3d 480, 494 (5th Cir. 2008) ("An appellant that fails to adequately brief an issue in his opening brief waives that issue.").

otherwise "ensure that workers do not step or trip into the hole or fall into it." 81 FR at 82596.

Prime failed to protect its employees from the uncovered hole and, accordingly, both failed to comply with the standard and exposed employees to the violative condition. Vazquez testified that the hole between the loading dock floor and the shipping container was usually present and, on July 12, 2022, he and the other crew members walked back and forth over the uncovered hole while carrying rope and lumber. Tr. 123:20-124:3, 116:8-15; *see also* Pet'r's Br. 16 ("there are necessarily gaps between the truck carrying the shipping container and loading dock"). Video footage of the crew's work from this same day confirmed that the crew repeatedly traversed over the uncovered hole. Dec. 17-18; Vol.(2)(Ex. C-7); Tr. 60:6-22. Although Prime had a dock plate at the facility which could be used to bridge the hole, it was infrequently used. Dec. 17-18; Tr. 114:15-18, 61:25-62:3 (Salem told CSHO Cabello that he was aware that the hole existed but that Prime does not use the dock plate to cover the hole unless Prime is loading an expensive low-profile vehicle in the container), 114:12-14 (Vazquez testifying that the dock plate would only be used if the loading dock and container were at different heights). The ALJ thus correctly determined that Prime violated 29 C.F.R. § 1910.28(b)(3)(i) and that Prime employees were exposed to the violative conditions. Dec. 17-18.

Substantial evidence also supports the ALJ's determination that Prime had knowledge of the hazardous condition. *See* Dec. 18-20. Knowledge may be established by showing that the employer had actual or constructive knowledge of the conditions that violated the standard. *S. Hens, Inc. v. OSHRC*, 930 F.3d 667, 675 (5th Cir. 2019). Here, Prime had both actual and constructive knowledge that its employees traversed an uncovered hole when loading cars into containers. Dec. 20 (finding that Prime "knew or, with the exercise of reasonable diligence, could have known of the hazardous condition").

First, the record evidence supports that Salem knew that the loading crew was not protected from falling or stepping into the uncovered hole. Salem's statements to CSHO Cabello "that he was aware of the gap" and about his employees' limited use of the dock plate prove that Prime actually knew about the hazardous condition. Tr. 61:20-62:3; *Calpine Corp. v. OSHRC*, 774 F. App'x 879, 883 (5th Cir. 2019) ("A supervisor's knowledge of a violative condition can be imputed to the employer"). Salem also acknowledged at hearing that the gap was created by the rubber bumpers on the edge of Prime's loading dock. Dec. 18-19; Tr. 138:11-15.

Second, substantial evidence supports the ALJ's finding that Prime had constructive knowledge of the hazardous conditions. Constructive knowledge may be established where the hazardous conditions are "open and obvious." *Mar-Jac*

*Poultry MS, L.L.C.*, No. 24-60026, 2025 WL 1904565, at \*12 (5th Cir. 2025) (unpublished); *Kokosing Constr. Co.*, No. 92-2596, 1996 WL 749961, at \*2 (OSHRC Dec. 20, 1996). Here, the ALJ rightly determined that Salem should have known about this "open, obvious, and consistent condition" with the exercise of reasonable diligence because the bumpers on the loading dock "by necessity, create[ ] a gap between the dock floor and the shipping container to be loaded," Dec. 18-19 (citing Tr. 138), and the loading crew repeatedly crossed the gap without a dock plate cover as they loaded vehicles, including on July 12, 2022. Dec. 18. Given that Salem was aware that the loading crew only used the dock plate to cover the hole in limited circumstances, Dec. 19, Salem undoubtedly could have known with the exercise of reasonable diligence that employees crossed over the uncovered hole during their work.[11] *See id.* (explaining that employer's "obligat[ion] to provide safe working conditions and ensure safe work practices" includes a "requirement to inspect the workplace and correct unsafe working conditions").

---

[11] Although not relied on by the ALJ to establish Prime's constructive knowledge of the violation, the record supports that Prime also had constructive knowledge of the violation because it had an inadequate safety program. *See, e.g., Byrd Telcom, Inc. v. OSHRC*, 657 F. App'x 312 (5th Cir. 2016). Prime's safety program was inadequate to prevent its violation of 29 C.F.R. § 1910.28(b)(3)(ii), for example, because Salem testified that he had no work rules about the use of the dock plate. Tr. 130:15-21; *see, e.g., Byrd,* 657 Fed.App'x. at 316 (constructive knowledge established where employer lacked work rules designed to address the hazard).

Prime suggests that it lacked knowledge of the violative conditions because the truck drivers who delivered the containers created the gaps between the loading dock and the receiving truck, Pet'r's Br. 16-17, but this complaint lacks merit. "Under the [OSH] Act, it is the employer's responsibility to ensure that its employees are protected" from hazards and Prime cannot "shift its statutory responsibility for the health and safety of its employees to third parties." *Brock v. City Oil Well Service Co.*, 795 F.2d 507, 511-12 (5th Cir. 1986). Regardless of what role third parties may have had in creating the hole at Prime's workplace, Prime's obligation to its employees included "inspect[ing] the workplace, anticipat[ing] hazards to which employees may be exposed, and tak[ing] measures action to prevent the occurrence of violations." [12] *N & N Contractors, Inc.*, No. 96-

---

[12] Commission case law recognizes a "multi-employer worksite defense" in which an employer can argue, as an affirmative defense, that it should avoid liability for a violation because it "(1) did not create the hazardous condition, (2) did not control the violative condition such that it could have realistically abated the condition in the manner required by the standard, and (3) took reasonable alternative steps to protect its employees or did not have (and could not have had with the exercise of reasonable diligence) notice that the violative condition was hazardous." *Capform, Inc.*, No. 91-1613, 1994 WL 530815, at *2 (OSHRC Sept. 29, 1994). Prime did not raise and argue this affirmative defense in its answer or petition for discretionary review. *See* Vol(3)(9, 40); 29 U.S.C. § 660(a) ("No objection that has not been urged before the Commission shall be considered by the court…"), but even if Prime had, the defense would have failed. First, Prime created the hazardous condition because the rubber bumpers on the side of its loading dock were the cause of the hole. Tr. 138:7-15. Second, even assuming that Prime did not create the hazardous condition, Prime was aware of the hazardous conditions and could have used the dock plate, which was "always" available, to abate the hazard. Dec. 6, 17; Tr. 130:15-21.

0606, 2000 WL 665599, *2 (OSHRC May 18, 2000) (citation omitted); *see also Carlisle Equip. Co. v. Sec'y of Labor*, 24 F.3d 790, 794 (6th Cir. 1994) ("Reasonable diligence implies effort, attention, and action, not mere reliance upon the action of another."). Here, Prime failed to make a reasonably diligent effort to ensure that employees were protected from the risk of falling or stepping into the hole between the loading dock and the containers into which Prime employees loaded cars.

The ALJ correctly rejected Prime's argument that there was no hazard from the hole because there were no accidents involving the hole.[13] Dec. 18. As explained *supra,* where, as here, an OSHA standard is violated where a specific condition exists, "hazard is presumed, and the Secretary need only show the existence of the violative condition and worker exposure to the condition." *Bunge*, 638 F.2d at 835; *see also Gen. Motors Corp., Rochester Prod. Div.*, No. 80-5439,

---

[13] Prime's reference to *Owens-Corning*, *see* Pet'r's Br. at 16, is misplaced, as that case addressed a "general," or "performance," standard, 29 C.F.R. § 1910.132(a); and stated that "a very low injury rate" was relevant to "whether an employer has notice that personal protective equipment is necessary under a general regulation." 659 F.2d 1285, 1290 (5th Cir. 1981). However, § 1910.28(b)(3)(i) is a specification standard, as it "does not set a goal for an employer to meet with flexible methods," but rather is "explicit and unambiguous" as to what employers must do to protect employees. *See Echo Powerline, L.L.C. v. OSHRC*, 968 F.3d 471, 478 (5th Cir. 2020) (discussing difference between "performance standards" and "specification standards"). As such, its terms "must be adhered to strictly" irrespective of whether the violative condition injured any Prime employees in the past. *Id.*

1985 WL 44845, at *3 (OSHRC Apr. 26, 1985) (the "finding of a violation is not based on the occurrence of the accident but on the foreseeable exposure" of employees to a hazard).[14] As the ALJ recognized, Dec. 18, "[t]he goal of the Act is to prevent the first accident, not to serve as a source of consolation for the first victim or his survivors." *Brown & Root, Inc., Min. Indus. Heavy Const. Grp.*, No. 79-2224, 1981 WL 40349, at *4 (5th Cir. Mar. 19, 1981) (unpublished). Here, Prime violated 29 C.F.R. § 1910.28(b)(3)(i) and a hazard therefore existed regardless of whether a Prime employee had ever suffered an injury due to the uncovered hole. Prime's argument fails and this Court should uphold the ALJ's decision affirming this citation item.

III.  **Substantial Evidence Supports the ALJ's Determination that Prime Violated 29 C.F.R. § 1910.212(a)(3)(ii) Because it Failed to Ensure that a Chopsaw that Employees Regularly Used to Cut Wire Rope Was Properly Guarded.**

Substantial evidence in the record supports the ALJ's determination that Prime violated 29 C.F.R. § 1910.212(a)(3)(ii), which requires employers to guard the points of operation of machines whose operation expose employees to injury. Particularly, ample evidence supports the ALJ's findings that Prime violated the terms of the standard because the chopsaw's blade was not properly guarded,

---

[14] To the extent Prime cites the lack of prior injuries to argue against employer knowledge, that also "misses the mark" because "the requisite knowledge is only of the physical conditions constituting the violation." *S. Hens, Inc.*, 930 F.3d at 681.

employees had reasonably expected exposure to the unguarded blade when cutting certain materials, and Prime had actual and constructive knowledge that the chopsaw's blade was not properly guarded.[15] *See* Dec. 24-28.

Section 1910.212(a)(3)(ii) "requires that the point of operation of a machine be guarded if the operator is exposed to injury, and that the guarding device be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle." *Stacey Manufacturing Co., Inc.*, No. 76–1656, 1982 WL 22594, *4 (OSHRC Mar. 23, 1982). Here, Prime's DeWalt chopsaw, a machine which has a hazardous point of operation (a spinning blade), came with such a guard, but the guard had been tied up, and thereby bypassed, leaving two inches of the blade exposed during operation.[16] Dec. 24-25; Vol.(2)(Exs. C-5a, C-5b). Operation of the chopsaw in this condition exposed employees to laceration and amputation hazards from two inches of an unguarded, spinning blade. Tr. 78:21-79:14, 80:18-25; Vol.(2)(Ex. C-5c). Substantial evidence

---

[15] In its opening brief, Prime does not challenge that the ALJ's determination that standard applied, Dec. 25, therefore any such argument is waived. *See, e.g., Elashyi*, 554 F.3d at 494.

[16] Because the relevant OSHA standards dictate the relevant machine guarding requirements, Prime's complaint that CSHO Cabello "articulated no appropriate standards for the safe use of the chopsaw" is irrelevant. Pet'r's Br. 18.

thus supports the ALJ's finding that Prime's chopsaw was not guarded in compliance with § 1910.212(a)(3)(ii).

Substantial evidence also supports the ALJ's finding that Prime employees were exposed to the chopsaw's unguarded point of operation. *See* Dec. 25-27. To establish that an employee had access or exposure to the hazardous condition, the Secretary does not need to show that any employee was actually exposed to the hazardous condition, *Mineral Indus. & Heavy Const. Grp. v. OSHRC*, 639 F.2d 1289, 1294 (5th Cir. 1981), but rather that "it is reasonably predictable either by operational necessity or otherwise (including inadvertence), that employees have been, are, or will be in the zone of danger." *S. Hens, Inc.*, 930 F.3d at 681.

At Prime's loading dock, the unguarded chopsaw was readily available for Prime employees to use; CSHO Cabello found it "right in front of the shipping container where the employees were located" and working to suspend vehicles for transit in shipping containers. Dec. 25; Tr. 80:9-17, Tr. 82:13-18; Vol.2(Ex. C-5b). Moreover, the evidence established that Prime employees regularly used the unguarded chopsaw by operational necessity, as all loading crew employees needed to use this chopsaw to cut wire rope to load cars. Dec. 25, 27; Tr. 79:21-80:2, 82:13-18, 109:25-110:9. As they cut the wire rope, employees' fingers were close to the unguarded opening to the point of operation. Tr. 81:1-8. CSHO Cabello testified that, during his inspection, Salem told him that "employees had to

tie the guard under the DeWalt saw to cut the three-eight inch steel wire rope." Tr. 82:19-25. Salem told CSHO Cabello that the guard was still tied up during OSHA's inspection because employees had "forgot to put the guard back down," Tr. 83:1, and Salem "did not directly dispute this conversation occurred" during the hearing. Dec. 26. It is also undisputed that Prime did not have any policies or procedures prohibiting employees from bypassing the guard or using the chopsaw in that condition, Dec. 27-28; Tr. 83:2-11, during which Prime's employees' fingers were exposed to two inches of whirring blade as they cut wire rope. Tr. 81:1-23.

Accordingly, substantial evidence supports the ALJ's finding that Prime employees had reasonably predictable exposure to the chopsaw's unguarded blade, even though CSHO Cabello "did not witness anyone using the chopsaw" with the guard tied up. *See* Pet'r's Br. 18. Proof of actual exposure to the hazard is not necessary, *Mineral Indus.*, 639 F.2d at 1294, and the ALJ reasonably determined, based on CSHO Cabello's photos, witness testimony, and the lack of any work rules prohibiting the use of the chopsaw with its guard bypassed, that it was "reasonably predictable either by operational necessity or otherwise (including inadvertence), that [Prime] employees ha[d] been, are, or will be in the zone of danger." Dec. 27 (citation omitted); *see Kaspar Electroplating Corp.*, No. 90-2866, 1993 WL 522462, *3 (OSHRC, Dec. 16, 1993) (finding "reasonably

48

predictable" exposure to a hazard where CSHO, during inspection, observed a unplugged bandsaw with a bent guard that exposed one-and-a-half inches of blade, employees used the bandsaw on an as-needed basis, and the employer had no rules prohibiting employees from using the saw in that condition).

When making this finding, the ALJ reasonably gave greater probative weight to the above-discussed evidence than Vazquez's statements that the chopsaw's blade guard was "always down." Tr. 117-18; Dec. 25-26. In response to several of the Secretary's questions about the chopsaw and its use, Vazquez repeatedly testified that he did not remember or recall, Dec. 25-26; Tr. 116:21-117:6, and ALJs routinely afford less probative weight to vague or forgetful testimony. *N.L.R.B. v. E-Sys., Inc.*, 642 F.2d 118, 120 (5th Cir. 1981) (upholding portion of ALJ decision where other testimony was credited over a witness who "testified somewhat vaguely" on the same topic). The ALJ reasonably gave more credit to CSHO Cabello's testimony, the majority of which was "corroborated by the record," Dec. 26, that Prime admitted that employees commonly used the unguarded chopsaw to cut wire rope, and the Court should not second-guess the ALJ's reasonable weighing of the evidence. *Phoenix Roofing, Inc. v. Dole*, 874 F.2d 1027, 1029 (5th Cir. 1989) (the Court does "not reweigh the evidence or independently evaluate evidentiary conflicts" when conducting substantial evidence review of a Commission order).

Finally, the ALJ's determination that Prime had knowledge of the hazardous condition is also well-supported. *See* Dec. 27-28. Salem's statements to the CSHO during the inspection show Prime's actual awareness that employees regularly tied up the chopsaw's guard and used the saw in that condition to cut wire rope. *See, e.g.*, *Envision Waste Servs., LLC*, No. 12-1600, 2018 WL 1735661, at *27 (OSHRC ALJ, Apr. 4, 2018) (establishing employer's actual knowledge of violative conditions based on employer's statement to CSHO during inspection). The ALJ astutely determined that CSHO Cabello's testimony about Salem's statements during the inspection was "more credible" than Salem's self-serving claim during the hearing that he had "no knowledge of anyone using [the chopsaw] that way," Dec. 26 (citing Tr. 130), and this Court must uphold that determination on review. *Phoenix Roofing,* 874 F.2d at 1029 (the Court does "not reweigh the evidence or independently evaluate evidentiary conflicts"); *Kelly Springfield Tire Co., Inc. v. Donovan*, 729 F.2d 317, 322 n.6 (5th Cir. 1984) (the Court "will not overturn the Commission's basic credibility determinations unless they are contradicted by 'uncontrovertible documentary evidence of physical facts'") (citation omitted).

Additionally, the ALJ correctly held that Prime should have known, and thus had constructive knowledge, of the violative conditions because Prime failed "to have adequate work rules and training programs, to adequately supervise

50

employees, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence of violations." *Lake Erie Constr. Co., Inc.*, No. 02-0520, 2005 WL 2902315, at *1 (OSHRC Sept. 23, 2005) (establishing constructive knowledge because of the employer's failure to fulfill these duties). Prime did not attempt to rebut CSHO Cabello's testimony that it did not have any work rules with respect to safe use of chopsaw, Tr. 83:2-11, nor did Prime put forward evidence that it ever conducted inspections or walkthroughs of the worksite to ensure that the loading crew performed its tasks safely. Dec. 27-28. Likewise, there is no evidence that Prime trained the loading crew on the safe use of the chopsaw. Thus, even if Salem did not have actual knowledge of his employee's regular use of the chopsaw with the guard bypassed, Prime had constructive knowledge of that hazardous conduct. Accordingly, substantial evidence supports the ALJ's finding that Prime had both actual and constructive knowledge of this violative condition, and the Court should uphold the ALJ's decision affirming this citation item.

## CONCLUSION

For the foregoing reasons, this Court should deny Prime's petition for review.

Respectfully submitted,

JONATHAN L. SNARE
Acting Solicitor of Labor

51

LAUREN GOODMAN
Acting Associate Solicitor of Labor for
Occupational Safety and Health

LOUISE M. BETTS
Counsel for Appellate Litigation

s/ Daniel M. Moczula
DANIEL M. MOCZULA
Attorney
U.S. Department of Labor
201 Varick Street RM 983
New York, NY 10014
202-693-5443

# CERTIFICATE OF COMPLIANCE

This brief was produced using Microsoft Word, in Times New Roman Style 14-point typeface, and complies with the type-volume limitation prescribed in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,077 words, excluding the information exempted by Fed. R. App. P. 32(f).

s/ Daniel Moczula
DANIEL MOCZULA
Attorney

## CERTIFICATE OF SERVICE

I certify that on July 25, 2025, I served a copy of the foregoing Brief of

Respondent Secretary of Labor on counsel for Prime International Shipping L.L.C.

through the Court's CM/ECF system.


                                        s/ Daniel Moczula
                                        Daniel Moczula
                                        Attorney